# STATE OF CONNECTICUT *v.* CASEY LIEM SULLIVAN
## (SC 20965)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

*Syllabus*

The defendant appealed, on the granting of certification, from the judgment of the Appellate Court, which had affirmed his conviction of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree. During rebuttal closing argument, the prosecutor listed four defenses that, according to her, defendants "usually" raise in criminal cases, and she noted two additional defenses that she claimed defendants "generally" raise in sexual assault cases, which she referred to as the "nuts and sluts" defenses.

The prosecutor then asked the jury, "do you think [the victim] is nuts? Because she'd have to be nuts to make all of this up." The defendant claimed that the Appellate Court had incorrectly determined that the prosecutor's remarks during rebuttal were not improper and that he was entitled to a new trial. *Held*:

Although the Appellate Court incorrectly concluded that the prosecutor's statements during rebuttal closing argument were not improper, the improprieties nevertheless did not deprive the defendant of a fair trial, and, accordingly, this court affirmed the Appellate Court's judgment.

The prosecutor's use of the phrase "nuts and sluts" improperly appealed to the jurors' emotions and diverted their attention from their duty to decide the case solely on the evidence, as it was a highly inflammatory and crass phrase that the jurors would likely find offensive, it suggested that the jury's legal duty required passing moral judgment on the victim, and it strayed from the evidence presented at trial, which concerned whether the victim had a motive to lie and not whether the victim was insane or promiscuous.

The prosecutor did not shift the burden of proof to the defense by listing the defenses that can be asserted in criminal cases, including those involving allegations of sexual assault.

351 Conn. 798 MAY, 2025 799

State *v.* Sullivan

However, by suggesting that the theory of defense was that the victim was "nuts," the prosecutor distorted the state's burden of proof, as she essentially argued that, unless the jury finds that the victim was "nuts," it must find the defendant guilty, and as the prosecutor mispresented the defendant's actual theory of defense, which was that the victim had a motive to lie, and substituted her own theory, which was that the victim would have to be "nuts" to fabricate her allegations.

The prosecutor's listing of four defenses that, according to the prosecutor, defendants "usually" raise in criminal cases was improper because the list was drawn from the prosecutor's own experience and was unrelated to the evidence.

This court recognized that the prosecutor's use of the inflammatory phrase "nuts and sluts" was inappropriate and that her conduct sometimes fell short of the high ethical and professional standards to which prosecutors are to be held, but, upon applying the factors set forth in *State* v. *Williams* (204 Conn. 523), this court concluded that the identified improprieties did not deprive the defendant of his right to a fair trial.

Specifically, the prosecutor's statements were not severe when viewed in light of the entire trial, as defense counsel failed to object, to request curative instructions, or to move for a mistrial in response to those statements, the improprieties were isolated or infrequent, and the state's case was relatively strong.

(*One justice dissenting*)

Argued December 9, 2024—officially released May 20, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, and tried to the jury before *Chaplin, J.*; verdict and judgment of guilty, from which the defendant appealed to the Appellate Court, *Cradle, Clark* and *Palmer, Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Trent A. LaLima*, with whom was *Virginia M. Gillette*, for the appellant (defendant).

State *v.* Sullivan

*Jonathan M. Sousa*, assistant state's attorney, with whom, on the brief, was *Anne Mahoney*, state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, Casey Liem Sullivan, appeals from the judgment of the Appellate Court, which affirmed the trial court's judgment of conviction, rendered after a jury trial, of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the third degree, and sexual assault in the third degree. See *State* v. *Sullivan*, 220 Conn. App. 403, 406, 429, 298 A.3d 1238 (2023). In this certified appeal, the defendant claims that the prosecutor in this case, State's Attorney Anne Mahoney, engaged in certain improprieties during her closing argument that deprived him of his due process right to a fair trial. We conclude that, although the prosecutor's statements were improper, they did not deprive the defendant of his constitutional right to a fair trial. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's decision sets forth the procedural history and many of the relevant facts, which we summarize and supplement with additional facts that the jury could have reasonably found. See id., 406–12. On March 29, 2017, K[1] texted the defendant to let him know that her daughter, C, would be spending the night with her. By this time, K had been living in the basement apartment of the defendant's raised ranch house for approximately three months. When C arrived at the defendant's house that evening after work, K was away at band practice at the house of her bandmate, M. C stayed in K's apartment, where no one else was present.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

State *v.* Sullivan

Sometime before 10 p.m., the defendant went downstairs and knocked on the basement door. C opened the door, and the defendant asked her if she needed anything and invited her upstairs to meet his dogs. She followed the defendant upstairs and through a dog gate that was at the top of the stairs. After C petted the defendant's dogs, the defendant approached C and gave her a hug. C kept her hands by her side because she did not feel comfortable being touched by someone who was unfamiliar to her. She then moved away from the defendant and told him that the interaction was "weird . . . ." Because she was scared, C hopped over the dog gate that was at the top of the basement stairs and went back downstairs to K's basement apartment.

Approximately one-half hour later, the defendant again went downstairs to the basement apartment, where C was. The defendant was holding his cell phone with C's Instagram account visible on the screen. He proceeded to show C photographs from her account, and he told her that she was attractive. Because of their previous interaction, the defendant's comments made C uncomfortable. During their brief conversation, the defendant invited C to come to his garage to view sculptures that he had made. To be polite, she said yes and followed the defendant to the doorway of the garage. C remained in the doorway to keep some distance from the defendant but watched the defendant show her the sculptures and other items in the garage.

The defendant then invited C upstairs to see more sculptures. She followed him upstairs, through the dog gate at the top of the stairs, and into a hallway leading to the defendant's bedroom. When the defendant entered the bedroom, C again remained in the doorway because she felt uncomfortable. While in the bedroom, the defendant told C that he had a projector in his room and that he wanted to "Netflix and chill" with her. C refused. The defendant walked toward the doorway to leave the

State *v.* Sullivan

room, at which point C moved back toward the hallway wall to give him space to walk by her and to keep her eyes on him. Instead of walking past C, who was standing with her back against the wall, the defendant approached C and put his hands on her hips. She shifted away from him and moved toward the basement stairs. She hopped over the dog gate to return downstairs to K's apartment. But, as C landed on the top step, the defendant, who had followed her, grabbed C under her arms and stopped her. He told C that she was "so light, [he] could just pick [her] up," and he proceeded to lift her back over the dog gate. The defendant carried C a short distance to a couch in his living room and set her on the couch. The defendant then lay on top of C and started kissing her neck and rubbing her breasts and her genitalia over her clothing. He told C that she was a "bombshell," that he "couldn't pass up the opportunity," and that she was "being quarantined." Because the defendant weighed significantly more than C, she was unable to move.

At some point, the defendant shifted his position on C. This allowed C to free her right hand and to use her cell phone. She immediately texted "help me" to K via a text messaging application, which was previously open on her cell phone. The defendant shifted his position again, which allowed C to wiggle out from underneath him. She told the defendant that she was expecting a phone call and moved toward the dog gate.

The defendant got up from the couch and followed C. As the defendant approached her, C turned toward him because she was afraid to have her back to him. The defendant used one of his legs to pin one of C's legs against the dog gate. The defendant then exposed his penis, grabbed C's free hand, and moved her hand toward his penis. C ripped her hand away and pushed the defendant. This enabled C to swing one leg over the dog gate as she attempted to get away. As this was

State *v.* Sullivan

happening, the defendant pulled down C's V-neck shirt and her bra, exposing her breasts. He then licked one of her exposed breasts and her neck. Once C lifted her second leg over the dog gate, she ran downstairs, entered K's apartment, and locked the door. As C ran downstairs, she heard the defendant yell "fuck" in an aggravated tone.

While attempting to flee from the defendant, C missed a phone call from K. After securing herself in K's apartment, C frantically called K. C told K what the defendant had done to her and begged K to get her out of the house. After hearing C's description of what had transpired, K sent angry text messages to the defendant. The texts stated, among other things: "Jail [a]sshole"; "[s]he's a kid you fuck";[2] and "[h]ere they come." K arrived shortly thereafter.

When K pulled up to the defendant's house, C exited the house and got into K's car. K then drove C toward M's house, stopping along the way to call the police to report what had happened. During the drive, and at M's house, C was crying and shaking as she explained the details of the incident to K.

At some point after K picked up C and called the police, K sent an additional text message to the defendant. K threatened to sue the defendant for allegedly locking her and her two year old son out of the house after she had failed to pay rent earlier that winter. K claimed that, because the defendant had locked her out, Connecticut law required that he pay her three months of rent. Prior to this incident, K had also been late in paying the security deposit that the defendant required as part of their oral rental agreement.

State troopers arrived at M's house less than one-half hour after C and K entered the house. The troopers

_____
[2] C was twenty years old at the time of the incident.

State *v.* Sullivan

spoke with C and K separately and took their written statements. C gave her statement to Trooper Kyle Cormier. C told Cormier the details of what had happened at the defendant's house. In response to C's statement that the defendant had kissed and licked her neck, Cormier photographed the area on C's neck that C identified and swabbed it for forensic evidence. Cormier also collected a "confirmatory sample" of C's saliva by swabbing the inside of her mouth. He did not take DNA swabs of the breast that the defendant had allegedly licked to avoid further victimizing C. He also did not collect any of C's clothing for testing. C declined to go to the hospital for medical treatment because she did not believe she was injured.

After collecting evidence from C, Cormier drove to the defendant's house. As part of his investigation, Cormier took photographs of the inside of the house and compared his observations of the house with what C had described to him. Several items corroborated C's story, including a sculpture on the coffee table, the couch in the living room, the dog gate, and the sculptures and projector in the bedroom. State troopers arrested the defendant the next day.

In September, 2017, an inspector collected a DNA sample from the defendant and later delivered the sample to the state forensic laboratory for comparative analysis. Forensic science examiners analyzed the sample collected from C's neck for the presence of amylase, an enzyme found in human saliva. No amylase was detected, which indicated that amylase either was not present or was present below a detectable level. The forensic science examiners then analyzed the same sample from C's neck for the presence of DNA. The results established that the sample contained a mixture of DNA that included DNA from C, the defendant, and one unknown individual. The results showed that the profile detected in the sample was at least 100 billion

State *v.* Sullivan

times more likely to occur if it originated from C, the defendant, and one unknown individual than if it originated from C and two unknown individuals, taken at random.

The state charged the defendant with unlawful restraint in the second degree in violation of General Statutes § 53a-96, sexual assault in the fourth degree in violation of General Statutes § 53a-73a (a) (2), attempt to commit sexual assault in the third degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-72a (a) (1), and sexual assault in the third degree in violation of § 53a-72a (a) (1). On the last day of a three day jury trial, during her closing argument, the prosecutor argued that the testimony and the other evidence supported the state's theory that the defendant had intended to sexually assault C and that he knew that C did not provide consent. The prosecutor emphasized that the outcome of the case largely turned on whether the jury found C's testimony credible. After summarizing the state's theory of the case, the prosecutor concluded by arguing to the jury, among other things, that, "when [you] put together what [C] said, and you look at the evidence in terms of the exhibits and whatnot, you will see that what [C] has given you is a credible account, and you will see, by virtue of her testimony, [that] the elements [of the crimes charged] are proven beyond a reasonable doubt."

During his summation, defense counsel began by arguing that C and K lacked credibility because they had both lied. Counsel emphasized that C testified that March 29, 2017, was the first time she had stayed overnight in K's basement apartment but that K testified that C had spent the previous night there too. Counsel also challenged C's testimony by highlighting inconsistencies in C's story and by questioning whether the timeline of events that C had provided was plausible. As for K, defense counsel began his discussion of her

State *v.* Sullivan

testimony by reminding the jury that it must consider "the truth and the veracity of the person or witness." Counsel pointed out that, when seeking to rent the apartment from the defendant, K had told the defendant that she had the $500 security deposit, yet she moved in without paying him the deposit. Defense counsel argued that this "[l]ie" went to K's veracity.

With respect to C, defense counsel argued that she had a motive to fabricate her story because K had an ongoing rent dispute with the defendant. As evidence, counsel noted that K had sent the defendant a text message demanding rent repayment while she was with C after the alleged sexual assault occurred. Defense counsel also emphasized that the tests conducted by forensic science examiners at the state forensic laboratory did not detect amylase in the sample collected from C's neck despite her claim that the defendant had "heavily" kissed and licked her neck, insinuating that she had lied. Counsel further argued that, although the defendant's DNA was found in the sample from C's neck, the DNA testing was so sensitive that the defendant's DNA could have been detected in the sample if C had touched items in the defendant's house and then touched her own neck. Counsel concluded by telling the jurors that, "if you put your emotions aside, rely on your intellect, all we have here is . . . a witness who was emotional, an actress, by the way, who lied about being there the night before, who gave you a timeline, and that timeline doesn't add up to her story. She tells you [that the defendant] made out on [her] neck, licked all over [her] neck heavily. But the evidence doesn't support that. And we have a coin flip [on] the DNA. So, based on all of that, I ask you to find [the defendant] not guilty of all charges."

The prosecutor began her rebuttal closing argument by addressing defense counsel's arguments about the timeline of events and the DNA and enzyme tests. She

State *v.* Sullivan

then turned to the issue of whether C had fabricated her story. The prosecutor made the following statements, which the defendant now challenges on appeal: "So, usually in that case, there are in criminal cases basically four defenses. It's alibi; somebody else did it; I did [it], [but] I was justified; or I did it, [but] I was out of my mind. In sex[ual] [assault] cases, it's generally nuts and sluts is what they call it. Either the victim has had other, you know, situations, [so] that you're not [going to] believe that she wasn't consenting, or she's nuts. And the question is, do you think [C] is nuts? Because she'd have to be nuts to make all of this up. There's no reason for her to fabricate this, is there? What does she gain out of this?" The prosecutor summed up the state's argument and concluded by saying to the jury that, "when you review the evidence, you'll find [that] it [is] proven beyond a reasonable doubt." Defense counsel did not object to the prosecutor's statements, request a curative instruction, or move for a mistrial. During the remainder of the prosecutor's rebuttal, she correctly stated that the jury's task was to determine whether C was credible.

After closing arguments, the trial court instructed the jury on the applicable law, including the presumption of innocence, the definition of "reasonable doubt," and the state's burden of proving each element of the charged offenses beyond a reasonable doubt. The jury found the defendant guilty on all charges. Thereafter, the trial court imposed a total effective sentence of ten years of incarceration, execution suspended after four years, followed by ten years of probation. The defendant was also ordered to register as a sex offender for his lifetime.

On appeal to the Appellate Court, the defendant claimed, among other things, that the prosecutor's use of the phrase " 'nuts and sluts' " was improper because it was highly inflammatory. *State* v. *Sullivan*, supra,

State *v.* Sullivan

220 Conn. App. 412. The defendant also argued that the prosecutor improperly discussed general defenses in criminal law cases and defenses specific to sexual assault cases, which suggested that the defendant had a duty to present one of those defenses. See id. The defendant contended that these improprieties deprived him of a fair trial. See id. The Appellate Court disagreed and concluded that the prosecutor's statements were not improper because they simply prefaced the state's response to defense counsel's argument that C had fabricated her story. See id., 416–20. The Appellate Court further reasoned that, even if the statements were improper, they did not deprive the defendant of a fair trial. See id., 420–23. This certified appeal followed.

The sole issue on appeal is whether the Appellate Court correctly determined that the prosecutor's statements during her rebuttal closing argument did not constitute prosecutorial impropriety that deprived the defendant of a fair trial. See *State* v. *Sullivan*, 348 Conn. 927, 305 A.3d 631 (2023). The defendant argues that the Appellate Court's decision was incorrect for two reasons. First, the defendant claims that the prosecutor's "nuts and sluts" statement was "highly inflammatory" and that it improperly appealed to the jurors' emotions. Second, the defendant claims that the prosecutor's listing of defenses improperly shifted the burden of proof and distorted the state's burden because the prosecutor implied that the defendant had a duty to present one of the six enumerated defenses.

The state contends that the prosecutor's use of the phrase "nuts and sluts" and listing of defenses were not improper. The state concedes that the prosecutor's use of the "nuts and sluts" phrase was "distasteful . . . ." But it argues that the use of the phrase was a proper "rhetorical flourish" because the prosecutor was responding to defense counsel's allegation that C had fabricated her story. Regarding the defendant's claim

State *v.* Sullivan

that the prosecutor improperly shifted the burden of proof to the defense and distorted the state's burden, the state argues that the Appellate Court was correct that the prosecutor's listing of defenses should also be understood as a response to defense counsel's suggestion that C had fabricated her story. See *State* v. *Sullivan*, supra, 220 Conn. App. 416–17. Accordingly, the state claims that the prosecutor's listing of defenses was simply an exhortation to the jury to adopt a "commonsense view of the evidence" and a preface to her discussion of the defendant's actual theory. The state also emphasizes that the prosecutor never expressly told the jury that the defendant was required to prove one of the defenses she listed. The state finally contends that, even if we assume, for purposes of our analysis, that the statements were improper, they did not deprive the defendant of a fair trial. We disagree with the defendant that the prosecutor shifted the burden of proof to the defense by listing the six defenses. But we agree that the prosecutor's use of the phrase "nuts and sluts" was improper because it distorted the state's burden of proof. We also conclude that the prosecutor's listing of defenses was improper because the list was based on her personal experience and was unrelated to the evidence presented at trial. We conclude, however, that the statements did not deny the defendant a fair trial. Accordingly, we affirm the judgment of the Appellate Court.

We begin with the guiding legal principles. "[A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process."[3] (Internal quotation marks omitted.)

_____

[3] Although defense counsel did not object to the prosecutor's statements, and, therefore, the defendant's claim is unpreserved, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need

State *v.* Sullivan

*State* v. *Washington*, 345 Conn. 258, 280, 284 A.3d 280 (2022). "First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 280–81.

"It is well established that prosecutorial impropriety can occur during final or rebuttal argument. . . . To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 580, 275 A.3d 578 (2022).

We have previously observed that, "[w]hen making closing arguments to the jury, [counsel] must be allowed a generous latitude in argument . . . ." (Internal quotation marks omitted.) *State* v. *Ciullo*, 314 Conn. 28, 37, 100 A.3d 779 (2014). The exact "limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom." (Internal quotation marks omitted.) Id. Consistent with this latitude, "[i]t does not follow . . . that every use of rhetorical

not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989) [as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015)] . . . ." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 579, 275 A.3d 578 (2022). Accordingly, "it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) Id.

State *v.* Sullivan

language or device [by the prosecutor] is improper.'' (Internal quotation marks omitted.) Id.

''Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case.'' (Internal quotation marks omitted.) Id. The heightened duty of prosecutors stems from their unique position and responsibilities in our judicial system. See, e.g., *State* v. *Stevenson*, 269 Conn. 563, 571–72, 849 A.2d 626 (2004). As this court has often emphasized, a prosecutor ''is not only an officer of the court, like every attorney, but is also a *high public officer, representing the people of the* [*s*]*tate, who seek impartial justice* for the guilty as much as for the innocent.'' (Emphasis added; internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 37–38; see, e.g., *State* v. *Dabate*, 351 Conn. 428, 472, 331 A.3d 1159 (2025) (noting that prosecutors are ''constitutional officers''); see also, e.g., Division of Criminal Justice, Connecticut Prosecution Standards (1st Ed. May, 2023) standard 1-1.1, p. 1, available at https://portal.ct.gov/dcj/-/media/dcj/07202023dcj-ct-pros-ecution-standards.pdf (last visited May 14, 2025) (recognizing that ''[t]he primary responsibility of a prosecutor is to seek justice within the bounds of the law, not merely to [obtain a] convict[ion]''). ''A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.'' Rules of Professional Conduct 3.8, commentary. Accordingly, although ''the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment [on], or to suggest an inference from, facts not in evidence, or to present matters [that] the jury ha[s] no right to consider.'' (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 38.

I

Having set forth the general legal principles guiding our review of the defendant's claims, we now consider

State *v.* Sullivan

whether the prosecutor's use of the phrase "nuts and sluts" and her listing of defenses were improper.

A

The defendant first claims that the prosecutor's use of the phrase "nuts and sluts" improperly appealed to the jurors' emotions. He argues that the phrase was "highly inflammatory," that its use improperly invoked the jury's sympathy by suggesting that the jury's legal duty required passing moral judgment on C, and that it strayed from the evidence. We agree with the defendant.

It is well established that a prosecutor should "not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal." (Citation omitted; internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 56. "It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible." (Internal quotation marks omitted.) *State* v. *O'Brien-Veader*, 318 Conn. 514, 526, 122 A.3d 555 (2015). By contrast, statements that have no reasonable connection to evidence offered or issues presented in a case are more likely to be deemed improper. See, e.g., *State* v. *Albino*, 312 Conn. 763, 775, 97 A.3d 478 (2014).

By using the phrase "nuts and sluts," the prosecutor used patently inflammatory language. Instead of using innocuous terms to describe these defenses, as she did

State *v.* Sullivan

with the general defenses and proceeded to do when explaining what "nuts and sluts" meant, the prosecutor instead chose to use a crass phrase that the jurors would likely find offensive and would cause them to reflexively side with the person baselessly accused of being insane or promiscuous. Its inflammatory nature was compounded by the fact that the prosecutor used the phrase during her rebuttal closing argument. As a result, defense counsel had no opportunity to respond.

The prosecutor's use of the phrase was also unrelated to the evidence in this case. Although the defendant's theory was primarily that C had a motive to lie because of K's rent dispute with the defendant, defense counsel never argued or suggested that C was either insane or promiscuous. Although defense counsel argued that C had a motive to lie, that is quite different from claiming that C is "nuts." Nor did defense counsel's argument warrant invocation of the inflammatory and misogynistic term "sluts." By defending C from a nonexistent allegation that she was either "nuts" or a "slut," the prosecutor inserted highly inflammatory language that was disconnected from the evidence and "calculated solely to appeal to the jurors' emotions." *State* v. *Albino*, supra, 312 Conn. 775. The prosecutor's use of the term "nuts and sluts" was, in short, gratuitous and inflammatory. Accordingly, we conclude that the prosecutor improperly appealed to the jurors' emotions and "divert[ed] the [jurors'] attention from their duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 56.

Although the state and the Appellate Court agree that the language was distasteful; see *State* v. *Sullivan*, supra, 220 Conn. App. 420; the state argues that the Appellate Court correctly concluded that the phrase was not improper because the prosecutor's purpose in using it was to challenge defense counsel's claim that C had a motive to lie. See id., 418. Even if the prosecutor

State *v.* Sullivan

was directly responding to the defendant's theory of the case, her purpose in using the phrase does not mitigate the inflammatory nature of the phrase itself. Nor is it of any consequence that the prosecutor may not have intended to use the phrase to personally attack the defendant—its use was improper because it was highly inflammatory and unrelated to the evidence. See, e.g., *State* v. *Michael T.*, 338 Conn. 705, 725, 259 A.3d 617 (2021) ("[a]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family" (internal quotation marks omitted)).

B

The defendant next claims that the prosecutor, in her rebuttal closing argument, improperly shifted the burden of proof to the defendant and distorted the state's burden of proof by listing four defenses that she claimed defendants "usually" raise in all criminal cases and two additional defenses that she claimed defendants "generally" raise in sexual assault cases. Although we agree that the prosecutor's remarks were improper, we disagree that they shifted the burden of proof to the defendant. However, we conclude that the prosecutor, by suggesting that the defendant's defense was that C was "nuts," distorted the state's burden of proof both by violating the principles set forth in this court's decision in *State* v. *Singh*, 259 Conn. 693, 793 A.2d 226 (2002), and by mischaracterizing the defendant's theory of the defense. Additionally, we conclude that the prosecutor's listing of four defenses that may be asserted in criminal cases was improper because it was drawn from the prosecutor's own experience and was unrelated to the evidence.

We note that the defendant argues, at times, that the prosecutor shifted the burden of proof to the defendant

State *v.* Sullivan

and, at other times, that the prosecutor distorted the state's burden of proof. Because our case law has not precisely articulated the differences between each claim—and has sometimes used them interchangeably—we take the opportunity to clarify those differences here.

A prosecutor improperly shifts the state's burden of proof to a defendant when the prosecutor argues that the defendant has a duty to produce evidence or otherwise bears some burden to prove their innocence or to disprove that an element of a crime can be established. See, e.g., *State* v. *Andrews*, 313 Conn. 266, 309, 96 A.3d 1199 (2014) (prosecutor did not impermissibly shift burden of proof to defendant by remarking that state did not have to prove moment of victim's death because relevant statute did not require proof of that fact as element of offense); see also, e.g., *United States* v. *Bautista*, 23 F.3d 726, 733 (2d Cir.) (addressing defendant's burden shifting claim and observing that "[t]he government may not . . . suggest that the defendant has the burden of producing evidence"), cert. denied sub nom. *Minier-Contreras* v. *United States*, 513 U.S. 862, 115 S. Ct. 174, 130 L. Ed. 2d 110 (1994); *United States* v. *Clark*, 982 F.2d 965, 968–69 (6th Cir. 1993) ("it would be improper for the prosecutor to suggest that the defendant had the burden of proof or any obligation to produce evidence to prove his innocence"); *United States* v. *Parker*, 903 F.2d 91, 98 (2d Cir.) (prosecutor may not "suggest that the defendant has any burden of proof or any obligation to adduce any evidence"), cert. denied, 498 U.S. 872, 111 S. Ct. 196, 112 L. Ed. 2d 158 (1990), and cert. denied sub nom. *Moon* v. *United States*, 498 U.S. 874, 111 S. Ct. 201, 112 L. Ed. 2d 162 (1990). With respect to a burden shifting theory of prosecutorial impropriety, the central idea is that the state shifted the burden of proof *to the defendant*. This is improper because "[i]t is axiomatic that the state [bears the bur-

State *v.* Sullivan

den of proving] all the essential elements of the crimes charged beyond a reasonable doubt in order to obtain a conviction.'' (Internal quotation marks omitted.) *State* v. *Milardo*, 224 Conn. 397, 410, 618 A.2d 1347 (1993); see also, e.g., *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (''the [d]ue [p]rocess [c]lause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged''). By contrast, criminal defendants have no burden to prove their innocence because they are presumptively innocent. See, e.g., *State* v. *Brawley*, 321 Conn. 583, 587, 137 A.3d 757 (2016) (''[t]he presumption of innocence, although not articulated in the [c]onstitution, is a basic component of a fair trial under our system of criminal justice'' (internal quotation marks omitted)).

A prosecutor distorts the state's burden of proof in situations in which the prosecutor argues that, to find the defendant guilty, the jury must find something other than that the state has met its burden of proving the defendant guilty beyond a reasonable doubt. See, e.g., *State* v. *Courtney G.*, 339 Conn. 328, 356–61, 260 A.3d 1152 (2021) (concluding that prosecutor distorted state's burden of proof by misstating reasonable doubt standard and mischaracterizing defendant's use of evidence); *State* v. *Singh*, supra, 259 Conn. 708–12 (holding that prosecutor distorted state's burden of proof by suggesting that, to find defendant not guilty, jury must find that state's witnesses had lied). Whereas a claim that a prosecutor shifted the state's burden of proof to the defendant emphasizes the improper burden placed on the defendant, a claim that a prosecutor distorted the state's burden emphasizes how the prosecutor improperly characterized or construed the burden that the state must meet.

State *v.* Sullivan

We first consider the defendant's claim that the prosecutor's listing of six defenses improperly shifted the burden to the defendant by suggesting that he was obligated to present one of those defenses. We disagree that the prosecutor's remarks reasonably could have been understood by the jury to make that suggestion. It would require a leap in logic to conclude that, by merely listing available defenses, without more, the prosecutor improperly argued that the defendant had the burden to present one of those defenses. In the present case, we conclude that, for three reasons, it is unnecessary for us to address whether merely providing such a list would suffice to impermissibly suggest that the defendant was obligated to present one of the enumerated defenses. First, the prosecutor twice used language indicating that the list of defenses was not intended to be exhaustive or exclusive. She stated that the first four listed defenses were defenses "usually" presented in criminal cases and that the two defenses to sexual assault offenses were ones "generally" made. The prosecutor thus recognized that, in some cases, the listed defenses may not be asserted. Second, at the time that the remarks were made, defense counsel had already presented to the jury the defense that C was not credible and that the alleged incident did not happen. Third, at no point did the prosecutor suggest that the defendant was obligated to present one of the listed defenses or that he otherwise bore the burden to present any defense. Accordingly, we cannot conclude that the prosecutor's remarks improperly shifted the burden to the defendant. In addition, the prosecutor noted several times, both in her initial closing argument and her rebuttal, that the state bore the burden of proving the defendant's guilt beyond a reasonable doubt. The trial court's instructions also made clear that the state bore the burden of proving each element of the charged offenses beyond a reasonable doubt and that the defendant was not obligated to testify or prove his innocence.

State *v.* Sullivan

The defendant also contends that the prosecutor distorted the state's burden of proof by telling the jury that C would "have to be nuts to make all of this up." We agree. The prosecutor listed, as general background, six different defenses that can be asserted in criminal cases that involve allegations of sexual assault, one of which was that the alleged victim was "nuts . . . ." By telling the jury that C would "have to be nuts to make all of this up," the prosecutor suggested that the defendant's theory was that C was "nuts" and essentially argued that the jury would have to find that C was "nuts" to find the defendant not guilty. That is, the prosecutor substituted the defendant's actual theory, which was that C, motivated by K's rent dispute with the defendant, had fabricated the allegations of sexual assault, with the prosecutor's version of the defendant's theory, which was that C had fabricated the allegations because she was "nuts . . . ."

By substituting the "nuts" theory for the defendant's actual theory, the prosecutor distorted the state's burden of proof. The prosecutor essentially argued that, unless the jury found that C was "nuts," it must find the defendant guilty. This distortion is similar to that which this court held to be improper in *State* v. *Singh*, supra, 259 Conn. 693. In *Singh*, we held that a prosecutor improperly distorts the state's burden of proof by arguing that the jury may find a defendant not guilty only if it finds that the state's witnesses had lied. See id., 708–12; see also, e.g., *State* v. *Dabate*, supra, 351 Conn. 445 (relying on *Singh* for proposition that prosecutor's remark that jury could find defendant not guilty only if it found that other witnesses had lied "distort[ed] [the] prosecutor's burden of proof"). In the present case, the prosecutor made a similar argument, improperly implying that the jury could find the defendant not guilty only if it believed that C was "nuts . . . ."

State *v.* Sullivan

In addition to violating the principles that this court has set forth in *Singh*, the prosecutor's remarks mischaracterized the defendant's theory of the defense, further distorting the state's burden of proof. As we previously explained, defense counsel argued that both C and K had lied. The defendant's theory of the case, therefore, was that the sexual assault never happened and that C and K had fabricated the allegations. At no point in his summation did defense counsel explicitly state or even imply that C was somehow insane or "nuts." He argued, rather, that C had a motive to lie because K was behind in her rent payments to the defendant. Accordingly, by suggesting that the defendant's theory was that C was "nuts," the prosecutor misrepresented the defendant's theory of the case. Because no evidence or argument had been presented regarding C's sanity, the prosecutor set an easier task for herself than rebutting the defendant's actual theory. See, e.g., *State* v. *Thierry*, 190 Wn. App. 680, 694, 360 P.3d 940 (2015) ("[t]he tactic of misrepresenting defense counsel's argument in rebuttal, effectively creating a straw man easily destroyed in the minds of the jury, does not comport with the prosecutor's duty to seek convictions based only on probative evidence and sound reason" (internal quotation marks omitted)), review denied, 185 Wn. 2d 1015, 368 P.3d 171 (2016). The prosecutor's misrepresentation of the defendant's theory of the defense was not remedied by the prosecutor's subsequent, correct statement that the jury's primary task was to determine whether C was credible. That correct statement of the law was clouded by the earlier suggestion that C would have to be "nuts" to fabricate the allegations of sexual assault.

The state nevertheless contends that the prosecutor's statements were not improper because the defendant's theory of the case was unreasonable. The state argues that the defendant's theory was unreasonable because

State *v.* Sullivan

the defense did not present direct evidence to show that C had knowledge of K's rent dispute with the defendant. We are not persuaded. Whether the defendant's theory of the case was reasonable is of no consequence. Even if the defendant's theory of the case was unreasonable, a prosecutor is not authorized to make any argument they wish, regardless of what the parties argued and what the evidence reasonably established. Rather, the prosecutor could have argued that the defendant's theory of the case was implausible and that the state's theory was more likely. As an impartial minister of justice, a prosecutor has a duty to avoid straying from the evidence and the facts of the case, even when advocating for the state's position during closing arguments. See, e.g., *State* v. *Ciullo*, supra, 314 Conn. 37–38. In other words, a prosecutor's closing arguments must, within reason, be limited to the facts established and the theory the state is advancing. Statements that stray far beyond these bounds cannot simply be excused as rhetorical flourish. Nor are we persuaded by the state's argument that the prosecutor was merely inviting the jury to take a "commonsense view of the evidence." Telling the jury that C would have to be "nuts" to fabricate her story is not "common sense" in the context of the whole trial and defense counsel's summation. Defense counsel never mentioned insanity or presented any evidence from which the jury could have reasonably inferred that C was insane. Claiming that C lied is not the same as claiming that she is insane. The prosecutor's "nuts" remark served only to divert the jury's attention from the real facts and issues presented in the case.

Finally, we also conclude that the prosecutor's listing of the four defenses that she claimed were "usually" presented in criminal cases—"[i]t's alibi; somebody else did [it]; I did [it], [but] I was justified; or I did it, [but] I was out of my mind"—was improper because it was unrelated to the evidence presented at trial. In making

State *v.* Sullivan

these remarks, the prosecutor appeared to be sharing her general legal knowledge, drawn from her own experience, with the jury. Such remarks have no place in a criminal trial and are improper. See, e.g., *State* v. *Daniel G.*, 147 Conn. App. 523, 560–61, 84 A.3d 9 (prosecutor improperly injected personal knowledge into case by describing how he would have reacted in defendant's situation), cert. denied, 311 Conn. 931, 87 A.3d 579 (2014); *State* v. *Houle*, 105 Conn. App. 813, 823–24, 940 A.2d 836 (2008) (it was improper for prosecutor to discuss personal experiences with alcohol in closing argument); *State* v. *McCarthy*, 105 Conn. App. 596, 631, 939 A.2d 1195 (prosecutor improperly discussed personal disappointment with automatic focus camera when there was lack of evidence adduced at trial regarding disappointing results produced by type of camera used by defendant's private investigators), cert. denied, 286 Conn. 913, 944 A.2d 983 (2008). These remarks, by referencing theories unrelated to the evidence presented at trial, risked distracting the jury from its primary task of determining whether C was credible. We agree with the dissenting opinion that the prosecutor's list of standard defense theories also risked distracting the jury for another, related reason: the list suggested to the jury that the prosecutor had knowledge of evidence that the jury had not seen and that supported the state's position.

II

Having concluded that the prosecutor's remarks were improper, we must now determine whether they deprived the defendant of a fair trial. "To prove prosecutorial [impropriety], the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the [impropriety] so infected the trial with unfairness as to make the conviction a denial of due process. . . . In weighing

State *v.* Sullivan

the significance of an instance of prosecutorial impro-
priety, a reviewing court must consider the entire con-
text of the trial, and [t]he question of whether the
defendant has been prejudiced by prosecutorial [impro-
priety] . . . depends on whether there is a reasonable
likelihood that the jury's verdict would have been differ-
ent [in the absence of] the sum total of the improprie-
ties.'' (Internal quotation marks omitted.) *State* v.
*Hinds*, 344 Conn. 541, 563, 280 A.3d 446 (2022).

To aid this court in determining whether a prosecu-
torial impropriety so infected the proceedings with
unfairness as to deprive a defendant of a fair trial, this
court applies the factors set forth in *State* v. *Williams*,
supra, 204 Conn. 540. These factors include (1) "the
extent to which the [impropriety] was invited by
defense conduct or argument," (2) "the severity of the
[impropriety]," (3) "the frequency of the [impropriety],"
(4) "the centrality of the [impropriety] to the critical
issues in the case," (5) "the strength of the curative
measures adopted," and (6) "the strength of the state's
case." (Internal quotation marks omitted.) *State* v.
*Hinds*, supra, 344 Conn. 563–64; accord *State* v. *Wil-
liams*, supra, 540.

Applying these factors, we conclude that the prosecu-
tor's improprieties did not deprive the defendant of a
fair trial. As to the first *Williams* factor, although
defense counsel argued that C had fabricated the sexual
assault allegations, the prosecutor's list of defenses and
use of the "nuts and sluts" phrase were unrelated to
these allegations and the evidence. Accordingly, we
conclude that the prosecutor's improprieties were not
invited by defense conduct or argument.

As to the second *Williams* factor, we conclude that
the prosecutor's statements were not severe when
viewed in light of the entire trial. In determining
whether prosecutorial impropriety is severe, this court

State *v.* Sullivan

"consider[s] it highly significant [if] defense counsel failed to object to . . . the improper remarks, [to] request curative instructions, or [to] move for a mistrial." *State* v. *Thompson*, 266 Conn. 440, 479, 832 A.2d 626 (2003). Defense counsel's failure to do these things is "a strong indication that [the improper remarks] did not carry substantial weight in the course of the trial as a whole and were not so egregious that they caused the defendant harm." *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019). In the present case, defense counsel did not object to the improper list of defenses and use of the "nuts and sluts" phrase, request a curative instruction, or move for a mistrial. Because defense counsel failed to do these things, "only instances of grossly egregious [prosecutorial impropriety] will be severe enough to mandate reversal." *State* v. *Thompson*, supra, 480. Although we think it is a close call, we conclude that the prosecutor's mention of the four general defenses and use of the phrase "nuts and sluts" were not grossly egregious improprieties. We reiterate that the use of that phrase was gratuitous and inflammatory and has no place in our courts. It is surprising that such language would needlessly be used by any attorney, let alone by a seasoned state's attorney. Nevertheless, we cannot conclude that this isolated incident, when viewed within the context of the entire trial, was sufficiently egregious so as to deprive the defendant of a fair trial.

Next, with respect to the third *Williams* factor, we observe that the prosecutor's listing of defenses and use of the "nuts and sluts" phrase occurred only once and within a brief time frame. See, e.g., *State* v. *Hinds*, supra, 344 Conn. 564. Even though the trial was short in length, the statements at issue were still infrequent. The prosecutor's statements occupied a brief paragraph in the transcript, and the prosecutor did not repeat any of the improper statements. Accordingly, we conclude that the third factor weighs in favor of the state.

As to the fourth *Williams* factor, the jury's resolution of the issues in the case largely depended on weighing C's credibility. Thus, the prosecutor's statement that the jury must find that C was "nuts" to disbelieve her testimony implicated the central issue in the case, as the state concedes.

As to the fifth *Williams* factor, the state rightly concedes that the trial court did not implement any curative measures. We agree with the state, however, that, although the trial court gave no specific curative instructions, the defendant "bears much of the responsibility for the fact that [the] claimed improprieties went uncured" because defense counsel did not object to the prosecutor's statements at trial. (Internal quotation marks omitted.) *State* v. *Angel T.*, 292 Conn. 262, 291, 973 A.2d 1207 (2009); see also, e.g., id. (emphasizing this court's "continue[d] . . . adhere[nce] to the well established maxim that defense counsel's failure to object to the prosecutor's argument . . . when [it is] made suggests that defense counsel did not believe that [it was] unfair in light of the record of the case at the time" (internal quotation marks omitted)). Moreover, the trial court properly instructed the jury on the applicable law, including the presumption of innocence, the definition of "reasonable doubt," and the state's burden of proving each element of the charged offenses beyond a reasonable doubt. Accordingly, we conclude that the fifth *Williams* factor militates against the defendant's argument.

Finally, with respect to the sixth *Williams* factor, we agree with the state that its case was relatively strong. As the state notes, whereas some sexual assault cases rest entirely on a complainant's credibility, in this case, the state presented physical and documentary evidence to support C's testimony. See, e.g., *State* v. *Ritrovato*, 280 Conn. 36, 57, 905 A.2d 1079 (2006) (noting that "a sexual assault case lacking physical evidence is not

State *v.* Sullivan

particularly strong"). The state presented DNA evidence that indicated the presence of the defendant's DNA profile on C's neck, in the place that she alleged he had kissed and licked her; text messages that C had sent to K during the sexual assault, pleading for help; C's statement to Cormier; and photographs that Cormier took in the defendant's house. This evidence corroborated C's account of what had happened, when the incident occurred, and where it occurred in the house. Although we agree with the Appellate Court and the dissenting opinion that the evidence was not overwhelming; see *State* v. *Sullivan*, supra, 220 Conn. App. 423; we conclude that the direct and circumstantial evidence was nonetheless sufficient evidence of the defendant's guilt. See, e.g., *State* v. *Courtney G.*, supra, 339 Conn. 365–66 (this court has "never stated that the state's evidence must have been overwhelming in order to support a conclusion that [a] prosecutorial [impropriety] did not deprive the defendant of a fair trial" (internal quotation marks omitted)).

We recognize that some of the *Williams* factors weigh in the defendant's favor. Nevertheless, we conclude that, when viewed in light of the entire trial, the prosecutor's improprieties were insufficient to establish that the defendant was deprived of a fair trial. See, e.g., *State* v. *Wilson*, 308 Conn. 412, 450, 454, 64 A.3d 91 (2013) (noting that one *Williams* factor was "ultimately dispositive of the issue of harmfulness"); see also, e.g., *State* v. *Pereira*, 72 Conn. App. 545, 563, 805 A.2d 787 (2002) (recognizing that *Williams* "factors are nonexhaustive, and do not serve as an arithmetic test for the level of prejudice flowing from [the prosecutorial improprieties]"), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003). Defense counsel's failure to object, to request curative instructions, or to move for a mistrial, combined with the fact that the improprieties were isolated, demonstrates that the prosecutor's comments did not

State *v.* Sullivan

substantially prejudice the defendant. See, e.g., *State* v. *Hinds*, supra, 344 Conn. 564.

The fact that we conclude that the improprieties did not result in an unfair trial for the defendant does not mean that we in any way condone the prosecutor's conduct or that we believe that the use of inflammatory language is befitting of "ministers of justice," such as prosecutors, who occupy "a quasi-judicial position" and who are "not only *representatives* of the state but are also *the* state and represent the societal interests of its people." (Emphasis in original.) *State* v. *Dabate*, supra, 351 Conn. 472. The residents of Connecticut rightly expect their prosecutors to be held to a very high standard and that "[c]ases brought on behalf of the [state] should be conducted with a dignity worthy of the client." (Internal quotation marks omitted.) *State* v. *Couture*, 194 Conn. 530, 567, 482 A.2d 300 (1984) (*Healey, J.*, dissenting), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); see also, e.g., Division of Criminal Justice, supra, Foreword, p. i (referencing "the Division of Criminal Justice's unwavering commitment to the highest standards of ethical and professional conduct"). We agree with the North Carolina Supreme Court's observation that the safety of a state's citizens "lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law . . . and who approaches his task with humility." (Internal quotation marks omitted.) *State* v. *Williams*, 362 N.C. 628, 635, 669 S.E.2d 290 (2008), quoting R. Jackson, The Federal Prosecutor, Address at the Second Annual Conference of United States Attorneys (April 1, 1940).

Notwithstanding the fact that the prosecutor sometimes fell short of those high standards in the trial of this case, we cannot conclude that "the trial as a whole was fundamentally unfair and that the [prosecutorial impropriety] so infected the trial with unfairness" as

State *v.* Sullivan

to deny the defendant his right to due process. (Internal quotation marks omitted.) *State* v. *Hinds*, supra, 344 Conn. 563.

The judgment of the Appellate Court is affirmed.

In this opinion MULLINS, C. J., and ECKER, ALEXANDER and DANNEHY, Js., concurred.

D'AURIA, J., dissenting. I agree with much of the majority opinion. For starters, I agree that the prosecutor's use of the phrase "nuts and sluts" improperly appealed to the jurors' emotions, diverted their attention from the evidence presented at trial, and distorted the state's burden of proof. I agree, too, that the prosecutor improperly injected her own personal experiences into the case by listing four general defenses that she claimed defendants "generally" rely on in criminal cases, and two additional defenses that defendants "usually" raise in sexual assault cases in particular, although I question the majority's assertion that jurors understood from the prosecutor's use of those words that this list was not exhaustive. See footnote 3 of this opinion. In any case, I agree that none of these defenses aligned with the actual defense raised by the defendant, Casey Liem Sullivan: that the state's witnesses were not credible and that the state therefore had not proven its case beyond a reasonable doubt. I also agree with a great deal of the majority's harm analysis, which it bases on the considerations that this court articulated in *State* v. *Williams*, 204 Conn. 523, 540–41, 529 A.2d 653 (1987).

I disagree, however, with the majority's conclusion that the prosecutorial improprieties in this case did not deprive the defendant of a fair trial and, therefore, with its affirmance of the defendant's conviction of unlawful restraint in the second degree, sexual assault in the fourth degree, attempt to commit sexual assault in the

State *v.* Sullivan

third degree, and sexual assault in the third degree. More specifically, I part ways with the majority when it concludes that the same improprieties, which it acknowledges were "gratuitous and inflammatory," did not deprive the defendant of a fair trial because they were isolated, not objected to, and followed what the majority considers to be a "relatively strong" evidentiary case presented by the state. In my view, the majority's harm analysis discounts significantly the prejudicial impact of the prosecutor's improper remarks. Given the particular circumstances of this case—in which the improprieties were among the final words that the jury heard from the parties, were neither responsive to, nor invited by, any of the defendant's arguments, and were central to the determinative issue of credibility—I believe that the prosecutor's improper remarks prejudiced the defendant's right to a fair trial by diverting the jury's attention from his defense and denigrating that defense to the level of a sexist colloquialism. Accordingly, I respectfully dissent. I would reverse the Appellate Court's judgment and remand the case for a new trial.

The prosecutorial improprieties in this short, three day trial occurred during the prosecutor's rebuttal summation, in the crucial moments of closing argument that mark the last time that jurors will hear directly from the parties. The crux of the prosecutor's argument was that the defendant had sexually assaulted the alleged victim, C, while she was staying in the defendant's house visiting her mother, the defendant's tenant. The defendant denied this allegation, arguing that C and her mother lied as part of a scheme to protect the mother from having to pay the defendant rent. Although the prosecutor began her summation rebuttal appropriately, she soon veered into improper territory by listing for the jury four defenses that defendants "usually" pose in criminal cases: "It's alibi; somebody else did it;

I did [it], [but] I was justified; or I did it, [but] I was out of my mind.'' She went on to describe, in crass terms that the state on appeal does not condone, two defenses that she claimed defendants typically raise in sexual assault cases: ''it's generally nuts and sluts . . . .'' Quite apparently recounting her experience prosecuting other sexual assault claims, she explained to the jury, ''[e]ither the victim has had other, you know, situations that you're not gonna believe that she wasn't consenting, or she's nuts. And the question is, do you think [C] is nuts? Because she'd have to be nuts to make all of this up. There's no reason for her to fabricate this, is there? What does she gain out of this?''

It is uncontested that the ''prosecutor's office carries a special prestige in the eyes of the jury.'' *State* v. *Singh*, 259 Conn. 693, 722, 793 A.2d 226 (2002). This prestige is warranted, and the prosecutor's influence is apparent. In the courtroom, the prosecutor is the personification of the state of Connecticut, charged with enforcing this state's criminal laws pursuant to the Connecticut constitution—a status that prosecutors often wear on their sleeves before this court. See Conn. Const., amend. XXIII. Simply put, when prosecutors speak, jurors listen. With this constitutional status, however, comes an increased responsibility to avoid engaging in the types of improper arguments that the prosecutor made to the jury in the present case, which distorted the state's burden of proof and inserted her own knowledge and experience into the record. See, e.g., *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 187, 243 A.3d 1163 (2020) ('' 'A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence.' '').

State *v.* Sullivan

Prosecutorial improprieties that distort the state's burden of proof may be harmful because, as the majority recognizes, they suggest that "the jury must find something other than that the state has met its burden of proving the defendant guilty beyond a reasonable doubt" to obtain a conviction. Part I B of the majority opinion; see *State* v. *Singh*, supra, 259 Conn. 709–10; see also *State* v. *Courtney G.*, 339 Conn. 328, 357–58, 360, 260 A.3d 1152 (2021). So, too, prosecutorial improprieties that inject a prosecutor's own knowledge into a trial are harmful because jurors might improperly carry that knowledge into their deliberations, which constitutes "a form of unsworn and unchecked testimony [that is] particularly difficult for the jury to ignore because of the prosecutor's special position." (Internal quotation marks omitted.) *State* v. *Gibson*, 302 Conn. 653, 660, 31 A.3d 346 (2011); see also *State* v. *Gold*, 180 Conn. 619, 659, 431 A.2d 501 ("[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict" (internal quotation marks omitted)), cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980).

Precisely because of the prestige and responsibility that accompanies the prosecutor's role as a " 'minister of justice' "; *Gomez* v. *Commissioner of Correction*, supra, 336 Conn. 187; a defendant's right to a fair trial is seriously jeopardized when "a prosecutor [tells] a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such an argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." (Internal quotation marks omitted.) *State* v. *Luster*, 279 Conn. 414, 434, 902 A.2d 636 (2006). That jeopardy is even greater, and

State *v.* Sullivan

the prosecutor's argument is even more distracting and confusing to jurors, when defense counsel has *not* in fact employed the "standard tactics" that the prosecutor has listed, because the improper remarks in that case create a void between the prosecutor's " 'unsworn and unchecked testimony' "; *State* v. *Gibson*, supra, 302 Conn. 660; and the evidence properly before the jury. That disconnect can suggest to jurors that the prosecutor has access to evidence that they have not seen; see, e.g., *State* v. *Singh*, supra, 259 Conn. 718; evidence that perhaps aligns with the prosecutor's contention that the defendant is, without the jury's knowledge, employing the same "standard tactics" described by the prosecutor, in turn increasing the potentially harmful impact of those improper remarks. See, e.g., *State* v. *Outing*, 298 Conn. 34, 85, 3 A.3d 1 (2010), cert. denied, 562 U.S. 1225, 131 S. Ct. 1479, 179 L. Ed. 2d 316 (2011); *State* v. *Fasanelli*, 163 Conn. App. 170, 183, 133 A.3d 921 (2016).

When evaluating the prejudicial impact of an impropriety, "[t]he object of inquiry before a reviewing court in [due process] . . . [is] the fairness of the entire trial, and not the specific incidents of [the improprieties] themselves." (Internal quotation marks omitted.) *State* v. *Spencer*, 275 Conn. 171, 178, 881 A.2d 209 (2005); see also *State* v. *Ciullo*, 314 Conn. 28, 36, 100 A.3d 779 (2014) (same). Several considerations gathered and detailed in this court's decision in *State* v. *Williams*, supra, 204 Conn. 540, guide this determination, including "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v.

832 MAY, 2025 351 Conn. 798

State *v.* Sullivan

*Hinds*, 344 Conn. 541, 563–64, 280 A.3d 446 (2022).[1] For example, in *State* v. *Wilson*, 308 Conn. 412, 64 A.3d 91 (2013), this court assessed the fairness of the defendant's trial in light of the specific facts involved, holding that the fact that the improprieties in that case were not central to the case's outcome was dispositive of the defendant's claim of prejudice, but that they "might well have amounted to a deprivation of due process if [the impropriety had] . . . proved material to the outcome of the trial." Id., 454. In *Williams* itself, this court remarked that the considerations that demonstrated harmfulness did so "*on the facts of* [*that*] *case* . . . ." (Emphasis added.) *State* v. *Williams*, supra, 550; see also C. Champagne, "Prosecutorial Misconduct in Connecticut: A Review," 78 Conn. B.J. 196, 228 (2004). Put differently, these considerations must guide, not hamstring, any harmfulness analysis that this court undertakes within the context of a particular set of facts.[2]

---

[1] The majority properly describes the nonresponsive nature of the prosecutorial improprieties in this case, and appropriately expresses skepticism of the state's argument on appeal that the prosecutor's remarks amounted to a "commonsense view of the evidence," considering that the defendant did not assert (1) an alibi defense, (2) that someone else had attacked C, (3) that he was justified in assaulting C, (4) that he was "out of [his] mind," (5) that C was insane ("nuts"), or (6) that C was promiscuous (a "slut"). (Internal quotation marks omitted.) I agree fully with the majority that the improprieties in this case were "unrelated to the evidence," and, in my view, also were in no way responsive to defense counsel's arguments at trial that the state's evidence was not credible.

[2] Like many multifactor tests, the "*Williams* factors," as they have come to be known, do not always capture all the criteria worthy of the court's consideration, or how particular criteria should be weighed in different factual circumstances. See, e.g., *State* v. *Skok*, 318 Conn. 699, 727, 122 A.3d 608 (2015) (*Zarella, J.*, concurring) ("More troubling, this court never has clarified the relative weight that should be accorded to each factor. Consequently, our decisions often have read like scorecards in which we unthinkingly have tallied how many factors supported the position of the claimant versus that of the opposing party."); *State* v. *Victor O.*, 301 Conn. 163, 174, 20 A.3d 669 ("[r]ecognizing the indefiniteness inherent in applying this multifactor approach, we observed that [t]he actual operation of each factor, as is the determination of which factors should be considered at all, depends greatly on the specific context of each case" (internal quotation marks omitted)), cert. denied, 565 U.S. 1039, 132 S. Ct. 583, 181 L. Ed. 2d 429 (2011).

State *v.* Sullivan

I agree with the majority that the "inflammatory nature [of these improprieties] was compounded by the fact that the prosecutor used [them] during her rebuttal closing argument . . . [when] defense counsel had no opportunity to respond." Part I A of the majority opinion; see *State* v. *Dabate*, 351 Conn. 428, 454, 331 A.3d 1159 (2025); see also *State* v. *Felix R.*, 147 Conn. App. 206, 230, 83 A.3d 619 (2013) (impropriety during rebuttal summation argument was harmful because it included "some of the last words the jury heard from the state"), rev'd on other grounds, 319 Conn. 1, 124 A.3d 871 (2015). It is not difficult to imagine that, in the context of this relatively brief trial, jurors might have interpreted the prosecutor's final pitch to mean that the defendant's defense was less worthy of consideration, or suspect in some way, because, according to the prosecutor, it was not among those that defendants "usually" or "generally" pose.[3] (Internal quotation marks omitted.) See *State* v. *Maguire*, 310 Conn. 535, 561, 78 A.3d 828 (2013) (improper, uninvited remarks were "relatively severe" because they "denigrated the defense theory of the case by mischaracterizing it"). There is ample, empirical evidence suggesting that improprieties that occur at the end of a trial enhance the likelihood of prejudice due to the persuasive value of closing argu-

---

[3] Although I agree that the improprieties in this case are best understood as distorting, rather than shifting, the state's burden of proof, I am not convinced, as is the majority, that the prosecutor's use of the terms "generally" and "usually" indicate "that the list of defenses was not intended to be exhaustive or exclusive." In my view, the majority's assertion presumes the prosecutor's intent, which we cannot know with certainty based on this record and is, moreover, not relevant to whether improprieties occurred. More importantly, it presumes that the jury *understood* this supposed intent and *appreciated* that the list of defenses was not exhaustive. I credit jurors with being attentive and intelligent, but I cannot agree that they would obviously appreciate such a subtle, legal point. See, e.g., *State* v. *Rodriguez-Roman*, 297 Conn. 66, 78, 98, 3 A.3d 783 (2010) (majority determined that qualifying term "including" modified "all of the antecedent language" in statute, whereas concurrence disagreed that same qualifying term did so).

State *v.* Sullivan

ments and the recency effect.[4] *State* v. *Silva*, 339 Conn.
598, 626, 262 A.3d 113 (2021) ("[c]losing argument is
an integral part of any criminal trial, for it is in this
phase that the issues are sharpened and clarified for
the jury and each party may present his theory of the
case" (internal quotation marks omitted)). Given the
recency effect and the brevity of the trial, it is also not
difficult to imagine that a clever phrase like "nuts and
sluts," made in a brief rebuttal and accompanied by a

[4] See M. Bowman, "Mitigating Foul Blows," 49 Ga. L. Rev. 309, 343–44
(2015) ("[W]hen prosecutors improperly . . . appeal to jury prejudices, they
may improperly shape juror narratives about the case. . . . [C]losing argu-
ments are particularly useful for solidifying the support of jurors already
inclined in one's favor and for providing ammunition for them to use in the
jury room 'so that they can become an extension of the advocate.' When
the prosecutor's argument is improper, jurors may still use it as ammunition.
And the inherent credibility advantage that prosecutors generally enjoy may
make jurors even more receptive to these arguments and may make it hard
for defense counsel to counter such arguments. These types of appeals might
be particularly powerful during closing arguments, as empirical research
supports the common wisdom among trial advocates about the persuasive
power of closing arguments on jurors. . . . [T]he 'recency effect' suggests
that people tend to remember best and be influenced by the latest event in
a sequence more than by earlier events. The recency effect can be exacer-
bated by the 'asymmetric rebound effect,' the process by which powerful
information can trigger a backlash against a strongly held belief. If a defense
attorney has succeeded in gaining sympathy or understanding for a defen-
dant, and the prosecutor responds by using inflammatory language or argu-
ments in rebuttal, the result may be an 'asymmetric rebound effect, whereby
the jurors would become incensed that they were 'suckered' into believing
that the defendant was deserving of sympathy and of the protections of the
Bill of Rights. That research is consistent with the empirical research show-
ing that exposure to 'anger-provoking stimuli increases the tendency to
blame other people for ambiguous events and to neglect alternative explana-
tions and possible mitigating circumstances.' For these reasons, inflamma-
tory prosecutorial arguments may significantly prejudice the defendant's
ability to receive a fair trial." (Footnotes omitted.)); see also R. Alford,
"Catalyzing More Adequate Federal Habeas Review of Summation Miscon-
duct: Persuasion Theory and the Sixth Amendment Right to an Unbiased
Jury," 59 Okla. L. Rev. 479, 514 (2006) ("because of the recency effect, the
closing argument has often been labeled the 'make or break' moment of
the trial, and lawyers are advised by many experts and consultants to plan
their entire trial strategy with the aim of constructing the optimal closing
argument").

351 Conn. 798 MAY, 2025 835

State *v.* Sullivan

list of defenses "usually" asserted by defendants, might leave an oversized impression on the jury. Compare *State* v. *Dabate*, supra, 351 Conn. 464 (Four instances of prosecutorial impropriety were "not sufficiently severe or frequent to deprive the defendant of a fair trial . . . . When considered in context of the 130 witnesses and the 600 exhibits presented during the five week trial, the harm was less pronounced insofar as the improprieties occurred infrequently."). In fact, it *is* difficult to imagine that leaving a mark on the jury was not the reason for this choice of words,[5] particularly considering the length of the prosecutor's rebuttal and the influence of prosecutors on jurors as "ministers of justice." Therefore, although perhaps in some trials, a brief, uninvited, isolated, and unobjected to remark might not establish that a defendant was harmed by prosecutorial impropriety, in the context of *this case*, I conclude, contrary to the majority, that these characteristics of the improprieties suggest a "reasonable likelihood of prejudice to the defendant." *State* v. *Reynolds*, 264 Conn. 1, 174, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I also disagree with the majority that we can conclude that the outcome of the defendant's trial was fair based on the relative strength of the state's case. Although I certainly agree that the state presented sufficient evidence to convict the defendant of sexual assault, as the majority accurately points out, that evidence was hardly overwhelming and ultimately came down to a credibility contest. See, e.g., *State* v. *Angel T.*, 292 Conn. 262, 295, 973 A.2d 1207 (2009) (prosecutorial impropriety is "significant" to harm in cases that hinge on credibility). Given

[5] Downplaying the significance of these remarks, the state on appeal contends that the prosecutor's comments, particularly the "nuts and sluts" remark, occurred during a "lengthy closing argument . . . ." See, e.g., *State* v. *Sullivan*, 220 Conn. App. 403, 421, 298 A.3d 1238 (2023). But the state's rebuttal was not lengthy at all, occupying just under four pages of transcript in the record.

State *v.* Sullivan

C's testimony that the defendant heavily licked and kissed her neck, the strongest evidence favoring the state's theory of the case—that the defendant indeed sexually assaulted C—was that the defendant's DNA was consistent with a sample taken from C's neck. But that sample notably did not detect amylase, an enzyme found in saliva. The defendant argued that, considering that C was staying in his house at the time of the alleged attack, without detectable amylase, the DNA evidence from C's neck could have originated from clothes, furniture, artwork, or other items in the house. The state contended, on the other hand, that a test result that did not detect amylase does not mean that amylase was not present at all but, rather, that it was merely present at undetectable levels. Although perhaps the jury accepted this explanation, it is also plausible that the jury could have taken this evidence as either neutral to or detracting from the state's argument, considering that evidence suggesting the lack of saliva on C's neck did not corroborate her account of events.

The state's remaining evidence was testimonial, making the jury's ultimate determination one of credibility. The jury could have reasonably questioned the credibility of the state's witnesses, considering the inconsistencies in the testimony of C and her mother on key facts. For example, C's mother testified that C had slept at the defendant's house the night before the attack and that the defendant was aware of that fact. C, however, testified that the only time she had ever been in the defendant's house prior to the night of the attack was, in passing, several weeks beforehand. The jurors also could have reasonably believed, as defense counsel asked them to, that C was motivated to fabricate the allegation against the defendant to help her mother avoid her obligation to pay rent to the defendant. This attack on C's credibility was based on the mother's text messages to the defendant and his girlfriend. Prior to

State *v.* Sullivan

the alleged attack, the mother had texted the defendant about C's staying overnight, to which he responded that, although it was fine if C stayed for short periods, her rent would increase if it became a long-term arrangement. Within one hour after C texted her mother for help, the mother sent both the defendant and his girlfriend separate messages about "suing [the defendant] for an automatic three months of rent," an odd topic for her to raise immediately after C alleged that the defendant had sexually assaulted her.[6]

Therefore, I would not, as the majority does, consider the strength of the state's case as a factor cutting against the defendant's harm argument in any significant way, given that the evidence was not overwhelming and came down to a credibility contest. To be clear, my point is not that it would be unreasonable on this factual record for a jury to find the defendant guilty. Rather, I believe that, in the absence of the prosecutor's improprieties, a reasonable jury could also have rejected the credibility of the state's witnesses and therefore not found the state's evidence sufficient to prove the defendant's guilt beyond a reasonable doubt. In other words, sufficiency cannot be enough in this context. Even when the state's case contains some persuasive evidence, a benchmark of our justice system is that the defendant is entitled

---

[6] Defense counsel questioned C's mother on this point:

"Q. Okay. And, at 11:36, you testified you were in a frantic state?

"A. Fran—yeah.

"Q. Okay. And you were so angry that fourteen minutes after the initial text, you texted my client about suing him for an automatic three months of rent to you?

"A. Okay. Yes.

"Q. Okay. So, my question is, you were upset about the alleged incident, correct?

"A. Of course.

"Q. But you were also concerned about getting three months of rent back to you?

"A. It was, I would say a moment of, again, looking for something to do when somebody has hurt your child to punish."

State *v.* Sullivan

to a fair trial at which he may present his defense to the jury without the state distracting the jury with improper matters. I simply am not convinced that that the evidentiary record in this case suggests the defendant was able to do so.

I appreciate that the majority has warned against using *Williams* as an "arithmetic test for the level of prejudice flowing from [the prosecutorial improprieties] . . . ." (Internal quotation marks omitted.) Part II of the majority opinion. I join that caution. I cannot help but point out, however, that the majority's analysis looks and feels much like an arithmetic test, mechanically prescribing that, for this court to consider reversing the defendant's conviction in this case, the prosecutorial improprieties must rise to an increased degree of egregiousness[7] because defense counsel failed to object. Rather, the majority should consider, overall, whether the defendant's trial was fair in light of those improprieties. Based on my analysis of the trial record, I would conclude that the state deprived the defendant of a fair trial given that the prosecutor's unprompted, unresponsive, and improper remarks implicated the central issue of credibility in the trial, distracted the jurors from that central factual issue, and distorted the state's burden of proof.

---

[7] I recognize that some of our case law supports the majority's contention that, when defense counsel fails to object to the improper remarks, as in the present case, "only instances of grossly egregious misconduct will be severe enough to mandate reversal." *State* v. *Thompson*, 266 Conn. 440, 480, 832 A.2d 626 (2003). But, given the number of factors that our precedent directs us to consider, under the specific facts of a particular case, without resort to "arithmetic" calculation, the supposedly "grossly egregious" standard is not always appropriate. For example, there is also case law that concludes that improprieties are severe based not solely on whether defense counsel objected to the remarks, but because they "denigrated the defense theory of the case by mischaracterizing it." *State* v. *Maguire*, supra, 310 Conn. 561. Therefore, although in some trials, a failure to object might be a "strong indication that [the impropriety] did not carry substantial weight"; *State* v. *Weatherspoon*, 332 Conn. 531, 558, 212 A.3d 208 (2019); that cannot be the case in all trials.

State *v.* Sullivan

The state asks this court to excuse the prosecutorial improprieties in the present case because they took place during what it describes as the " 'rough and tumble' " of closing argument. The state likely makes this entreaty because this court routinely provides generous latitude to prosecutors, perhaps to a fault, so that they may zealously advocate the state's position before a jury. In my view, however, that latitude is unwarranted here, considering that the prosecutor's improper and uninvited remarks in her rebuttal summation did not in fact *rebut* any argument the defendant had advanced. If what the state seeks is extra tolerance for clumsy or haphazard arguments that result in gratuitous and inappropriate remarks in rebuttal, my response is that there is too much at stake. It takes no lecture from a lone dissenter to appreciate, as I know that the state and the majority do, that an individual's liberty is on the line in a criminal case. The pressures that accompany attorneys into the litigation arena are hardly unique to prosecutors, or even to trial attorneys, and a defendant's fundamental right to a fair trial cannot be outweighed by the " 'rough and tumble' " of litigation. All lawyers, including those who argue cases before appellate courts (or hear them!), have undoubtedly said something on the record that they wish they could take back.

But it is the responsibility of the prosecutor, as a "minister of justice," to avoid veering into improprieties, and it is the responsibility of this court not to make a habit of excusing these sorts of improprieties because they were *perhaps* made in the "heat of the moment . . . ." *State* v. *Reynolds*, supra, 264 Conn. 205. Although we may not know if the prosecutor intended to make these plainly inappropriate arguments before the jury in this case, accommodating the prosecutor to the degree that the state suggests requires that we assume that she did *not* intend to weaponize the advantage provided to the state by our rules of practice when she saved these

State *v.* Sullivan

inappropriate remarks for rebuttal. See Practice Book § 42-35 (4) (referring to rebuttal as "final closing [argument]"). Indulging that assumption can sometimes strain credulity, as it does in this case, considering that, as the majority agrees, the improprieties were not responsive to anything that defense counsel had argued, and came toward the end of a short rebuttal argument, following an already short trial that hinged on credibility determinations.[8]

In my view, in the context of the present case, the prosecutor's conduct rendered the defendant's trial unfair, requiring a new trial. The improprieties distracted the jury from considering the defendant's theory of the case, distorted that theory, and implied that additional information, inaccessible to the jury, supported a guilty verdict. No amount of latitude for zealous advocacy— or the isolated nature of the improprieties, or the lack of objection by defense counsel, or the quality of the state's evidence—changes the fact that the defendant in this case is entitled to a fair trial at which he may present his defense to the jury, unencumbered by the

_____

[8] The state reports to us in its brief that "[t]he prosecutor did not invent the 'nuts and sluts' phrase" but, rather, it "entered the public consciousness decades ago through the rise of workplace discrimination lawsuits and is often used to describe the defense tactic of portraying women who bring sexual harassment claims as being too unstable to be believed or too promiscuous to be harassed." Nevertheless, during oral argument before this court, without prompting, the state's appellate counsel, who was not trial counsel, sought to excuse what he admitted were the prosecutor's "inartful" and "unnecessary" "rhetorical flourishes" at trial (although he stopped short of conceding that they were improprieties) by asserting that the prosecutor's remarks were "not a prescripted, preplanned argument." A question from the court followed, asking how appellate counsel knew that these remarks were unplanned and therefore made in the heat of the moment. Had the same prosecutor used this crass phrase at other times, in other cases, the court queried? Appellate counsel hadn't asked her, so he did not know. I am therefore unable to evaluate the basis for the representation that these improprieties were not "prescripted," as opposed to remarks that the prosecutor, if given the opportunity, planned to deliver, believing they would strike jurors as clever and memorable enough to bring with them into the deliberation room, no matter how ill-fitting or unresponsive they were to defense counsel's actual arguments.

351 Conn. 798 MAY, 2025 841

State *v.* Sullivan

prosecutor's injection of her own knowledge of standard defense strategies, along with crude, pejorative, and uninvited comments about those strategies. I do not believe the defendant was afforded that opportunity. Therefore, I respectfully dissent. I would reverse the judgment of the Appellate Court and remand the case for a new trial.