******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* JAMES BROWN
## (SC 20964)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted of murder in connection with the shooting death of the victim, the defendant appealed to this court. The shooting had occurred amid a fight between two rival groups with which the defendant and the victim, respectively, were affiliated. At trial, the clerk of the court informed the court that one of the jurors, Juror 7, had expressed concerns for her safety stemming from certain interactions with a trial attendee. After discussing the incident with counsel and canvassing both Juror 7, who denied having or expressing any such safety concerns, and the clerk, the court excused Juror 7 from the jury. The court then canvassed the remaining jurors. One of the remaining jurors, Juror 1, indicated that he had overheard Juror 7 raise safety concerns and that two other jurors, Jurors 3 and 6, had also overheard those concerns, but all of the other remaining jurors denied having or overhearing any conversations regarding concerns about the trial. Thereafter, defense counsel moved for a mistrial, contending that the canvass process itself made it impossible for the remaining jurors to be fair and impartial and that Jurors 1, 3 and 6 also should have been excused. The trial court denied that motion. On appeal, the defendant claimed, inter alia, that the trial court had abused its discretion when it declined to declare a mistrial. *Held*:

The trial court did not abuse its discretion in denying defense counsel's motion for a mistrial and excusing only Juror 7 from the jury.

The defendant was not entitled to a presumption, pursuant to *Remmer* v. *United States* (347 U.S. 227), that the allegedly improper interaction involving Juror 7 was prejudicial.

That presumption of prejudice applies only when some external interference with the jury's deliberative process via private communication, contact, or tampering with jurors relates directly to the matter being tried.

In the present case, the defense failed to demonstrate that the allegedly improper juror contact pertained directly to the merits of the matter rather than to the trial more topically.

The only inference of interference or tampering that the defense adduced was that Juror 7 believed that one or more trial attendees watched her walk to her car, before or after one of those attendees commented on her coat, Juror 7 later denied ever having or expressing any concerns about her safety when canvassed by the court, Juror 1 was the only juror who testified that Juror 7 had expressed such a concern, the trial court made no finding that threatening or intimidating conduct had occurred, and Juror 7 was excused because of her own conduct rather than because of any efforts at intimidation.

The trial court did not abuse its discretion when it declined to declare a mistrial, as the court, in canvassing all of the jurors, effectively ascertained the nature and import of any potential juror bias, each juror was unequivocal about his or her ability to be fair and impartial, no other juror stated that he or she had safety concerns, and the court was able to observe the jurors' answers to its questions and to assess their demeanor.

With respect to the defendant's claim that the trial court should have excused Jurors 3 and 6, it was speculative for the defendant to claim that those jurors had safety concerns despite their unequivocal testimony to the contrary, and, even if there were nonspeculative reasons to believe that Jurors 3 and 6 harbored safety concerns, the trial court had the unique opportunity to observe those jurors and to make credibility determinations, which it did through a meticulous and exhaustive canvassing process.

With respect to the defendant's claim that the trial court should have excused Juror 1 insofar as his statements that he did "[n]ot yet" have safety concerns and that nothing made him concerned "so far" were equivocal, those statements could reasonably be understood to communicate that, at the time of questioning, Juror 1 did not have any safety concerns, and there was nothing in the record to indicate that Juror 1 anticipated any such concerns in the future.

To the extent that the defendant contended that Juror 1 subjectively believed that the trial court cajoled him into disavowing his safety concerns, that argument was speculative and without merit.

The defendant could not prevail on his claim that the prosecutor's questioning of two witnesses, H and R, constituted prosecutorial impropriety that deprived him of his constitutional right to a fair trial.

No impropriety occurred when the prosecutor attempted to refresh H's recollection with his disavowed sworn statement to the police and asked H whether he had authored a sentence containing "word on the street" hearsay indicating that the defendant was the person who had shot the victim.

The prosecutor's ostensible purpose in asking about the hearsay was not to use it as substantive evidence but to lay a foundation for treating H as a hostile witness and to provide a basis for admitting H's prior sworn statement, and, when the trial court ordered the prosecutor not to refer to that hearsay again, he complied with that order.

The prosecutor did not improperly appeal to the jurors' emotions, passions, or prejudices when he asked R about the circumstances surrounding his arrest pursuant to a capias warrant.

Given that R had disavowed a prior sworn statement to the police in which he stated that he had witnessed the shooting of the victim, the prosecutor's questioning was permissible to discredit R's lack of recollection and to impeach R as someone who had changed his story to spread the word that he was not a snitch.

Moreover, defense counsel's extensive cross-examination of R about the circumstances of his arrest suggested that defense counsel did not believe that the prosecutor's line of questioning was improper.

Argued February 2—officially released May 19, 2026

*Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Droney, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Affirmed*.

*Denis J. O'Malley III*, assistant public defender, for the appellant (defendant).

*Nathan J. Buchok*, assistant state's attorney, with whom were *John F. Fahey*, state's attorney, and, on the brief, *Sharmese L. Walcott*, state's attorney, and *Robin D. Krawczyk*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. The defendant, James Brown, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes §§ 53a-54a (a) and 53a-8. In this direct appeal, the defendant claims that, following a juror's expression of safety concerns that were overheard by at least one other juror and communicated to court staff, the court abused its discretion by excusing only the complaining juror and denying defense counsel's motion for a mistrial. The defendant also claims that the prosecutor deprived him of his due process right to a fair trial by committing two instances of prosecutorial impropriety while questioning witnesses. We disagree and affirm the judgment of conviction.

This murder trial arose from a cold case investigation into the killing of the victim, Kennith Sullivan, in Hartford on June 26, 2008. The jury reasonably could have found the following facts. Members of two rival

groups living in Hartford—respectively named "Money Green Bedroc" and "Sandz-Bridge"—attended a concert at the XL Center (formerly the Hartford Civic Center). The defendant was associated with Money Green Bedroc and the victim with Sandz-Bridge. Inside the concert venue, the groups engaged in a fight that spilled outside of the arena. Once outside, the defendant and two other individuals from Money Green Bedroc retrieved firearms from a nearby vehicle. As the victim and other Sandz-Bridge members walked away from the scene, the victim saw the defendant approaching, stepped into the street, and said, "let's fight." The defendant then shot at the victim multiple times, striking him with what would prove to be a fatal gunshot to the stomach. The victim's associates placed him in the backseat of a car—but, after driving approximately one block, they removed him and left him in the street.

A crowd gathered in the street around the victim, with police officers and federal agents arriving shortly thereafter. The individuals at the scene fought with law enforcement and were generally uncooperative with attempts to gather information about the shooting. One member of the crowd stated: "We know who shot . . . my boy. Don't worry, we're going to get him." (Internal quotation marks omitted.) Once removed from the scene, the victim was transported to a hospital, where he died from the gunshot wound to his stomach. Following these events, members of Sandz-Bridge shot at individuals in Money Green Bedroc's neighborhood.

This 2008 cold case began to redevelop as eyewitnesses gave sworn statements to the police between 2013 and 2015. Edward Rosado, a friend of the victim, recounted his eyewitness account of the defendant's shooting the victim from a vantage point of about twenty feet. Iran Harris, a member of Sandz-Bridge, stated that the defendant spat at him during the concert and that he was one of the people walking with the victim when the shooting occurred. Harris also identified the defendant in a photographic array as someone with whom he had fought

at the concert. Harris did not identify the defendant as the person who shot the victim. However, two other individuals, one from Money Green Bedroc and one from Sandz-Bridge, provided sworn statements indicating that the defendant had shot the victim. In his statement, the Money Green Bedroc member recalled that the defendant had often "bragged" about killing the victim and that he had claimed the killing as his own "work . . . ." (Internal quotation marks omitted.) The Sandz-Bridge member stated that he was "positive" that the defendant was the person who shot the victim.

In light of these statements, the state charged the defendant with murder. Following trial, a jury found the defendant guilty, and the trial court sentenced him to a total effective sentence of forty years of imprisonment. The defendant now appeals directly to this court. See General Statutes § 51-199 (b) (3). Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the trial court abused its discretion in denying defense counsel's motion for a mistrial after a juror reported safety concerns arising from interactions with trial attendees, which were overheard by at least one other juror. The defendant first argues that the reported interactions triggered a presumption of prejudice pursuant to *Remmer* v. *United States*, 347 U.S. 227, 74 S. Ct. 450, 98 L. Ed. 654 (1954), and that, because the state failed to rebut this presumption, a new trial is required. The defendant further argues that, even without the *Remmer* presumption, the trial court's failure to declare a mistrial was an abuse of its discretion because "the jury had been tainted by the excused juror's fear for her safety," and, thus, "the fairness of the trial was irreparably damaged." The state responds that the *Remmer* presumption of prejudice does not apply in this case because the excused juror's safety concerns did not relate to the merits of the trial. The state further contends that the court did not abuse its discretion because it canvassed each juror on the record

to assess whether each juror could serve impartially and drew "demeanor-based credibility determinations" from these canvasses that supported its decision neither to declare a mistrial nor to excuse any additional juror.

The following additional facts and procedural history are relevant to our resolution of this claim. On March 10, 2023, the fifth day of evidence, the trial court relayed to counsel an incident concerning Juror 7:[1] "[T]he clerk informed me that . . . Juror 7 had taken her aside and had . . . a conversation . . . separate from other jurors. However, the other jurors were in the vicinity. . . . Juror 7 stated to the effect that, when she goes to the car at the end of the day, she noted that people from the [court-room's public] gallery were near the juror parking lot. . . . The clerk of the court has now told me . . . that Juror 7 feels uncomfortable coming into the courtroom if the defendant is present. So, what I'm going to do is make a record of the concerns that were reported to me and then take up what should be done next. It was the report of the clerk of the court . . . that the individuals that [Juror 7] saw did not say anything to her and have been respectful to her, but she did note their presence, and . . . she felt they watched her and other jurors. She asked the clerk about the verdict process and [whether the jurors] would have to give the verdict in open court. The clerk indicated, yes. She asked if she could leave directly after [the jury returned its verdict]. She did indicate in her comments that her concerns apply no matter what the verdict was, not guilty or guilty. . . . She has now indicated to the clerk of the court that she does not even feel comfortable coming into court if the defendant is present or there are people in the gallery, based on safety concerns. So, with that, I am obligated to hold a hearing on the record, which I am doing now. I'd like to hear from counsel if they have any position with respect to how the court should proceed."

Defense counsel agreed that the trial court should examine Juror 7 "on the record [and] under oath to see

[1] The jurors are referred to by their numbers or their first initials to protect their privacy interests. See, e.g., *State* v. *Hughes*, 341 Conn. 387, 406 n.13, 267 A.3d 81 (2021).

exactly what she has to say." He contended, however, that "it would be a safe bet that [Juror 7] expressed her concerns to the [other jurors], whether it be spoken or unspoken," noting that he was "of the belief [that] she's already poisoned" the other jurors. The court concluded that it did not "have any choice but to ask Juror 7 to come in."

At first, Juror 7 refused to enter the courtroom. The prosecutor suggested that, if Juror 7 would not testify about her safety concerns, the trial court should canvass every juror to "[ask] if [Juror 7's] concerns had been shared with any of them, and, even if they say 'no,' do they have any concerns about their ability to sit for the rest of the trial and [to] be fair and impartial?" Defense counsel objected, arguing that he did not want "this poisoned pill to be hinted at" by canvassing the rest of the jurors. He preferred that the court "order [Juror 7] to sit in that chair and [to] testify." The court concluded that, no matter the course of action, it would excuse Juror 7: "If she cannot come into the courtroom to answer my questions to decide whether there is an issue, that, in and of itself, shows that there is an issue, and she cannot sit [to] be a fair and impartial juror."

Before deciding whether to canvass the remaining jurors, the trial court ordered Juror 7 to enter the courtroom and to testify about her safety concerns. Juror 7's testimony was inconsistent with her concerns as reported by court staff. She testified that she had only asked court staff "a question about the process of the jury, like how things go." She also testified that she had not expressed any concerns to other jurors and that she and the other jurors had questions only about the logistics of jury service. After the court held a sidebar, it asked Juror 7 about her safety concerns directly. She denied having the concerns that had been reported by court staff. Presented with this denial, the court held another sidebar, after which it asked: "[W]ere you concerned [at] any time about coming into the courtroom because there would be people here in the gallery, and the defendant would be present?" Juror 7 answered: "I don't want people

thinking that I'm thinking there's concerns because there's not. . . . In fact, everybody that we've . . . come in contact with outside has been very nice and courteous. Hold[ing] doors open." The court then dismissed Juror 7 and instructed the clerk to testify so that there would be a record of Juror 7's original concerns. The clerk testified consistently with what the court had reported to the parties—specifically, that Juror 7 saw trial attendees watching her walk to her car.

After hearing the contradictory testimony of the clerk and Juror 7, the trial court excused Juror 7 from the jury. In response, defense counsel first stated that a full jury canvass was necessary to protect his client's right to an impartial jury, before arguing that a canvass would be futile because the jury was already "poisoned" and that any canvass in fact would further poison the jury. Specifically, defense counsel contended that Juror 7 feared the defendant's "side" of the courtroom "because of skin color" and that she may have "[let] on any . . . of her prejudices to the other jurors," as well as "her concerns for safety." For those reasons, counsel moved for a mistrial.

The trial court decided that it was "obligated" to canvass the remaining jurors "[i]n order to rule on defense counsel's motion for a mistrial . . . ." After a recess, the prosecutor and defense counsel each submitted proposed questions to the court for use in the canvass. The court then presented its final canvass questions to the parties. These questions included whether a given juror "ha[d] any conversations or overhear[d] any conversations with any juror about concerns about the trial, issues related to it or delivering a verdict"; whether the juror could be "fair and impartial"; and possible follow-up questions, depending on the juror's answers. Presented with this planned line of questioning, defense counsel objected, arguing that the court should explicitly ask the jurors whether they had any safety concerns. The court acknowledged defense counsel's objection but explained: "I don't want to mention the word 'safety.' I don't want to give it undue influence, as if it were to come from me that

it's something [the jurors] should be concerned about. However, I understand defense's position, and it's noted for the record. If they do raise an issue and say 'yes,' if they talk about safety, I'll inquire further, as necessary."

With this understanding, the trial court conducted its canvass of the remaining jurors individually, following the same line of questioning that the court had just presented to both parties. The court began with Juror 1:

"Q. First, did you have any conversations or overhear any conversations with any juror about concerns about the trial, issues related to it or delivering a verdict?

"A. So, I overheard one of the jurors, I think last week, or maybe the first of this week, [saying] that one of the spectators talked to her on her way out of the courtroom two days in a row and commented about her coat, and she wasn't sure whether she should be nervous about that or not. That's all I heard. I did comment to her that, if she was concerned, she should talk to the clerk.

"Q. Do you know which juror [said] that to you?

"A. [L].

"Q. Okay. Juror 7?

"A. I don't know her number.

"Q. And are you aware of anyone else overhearing that?

"A. Yes.

"Q. And who else do you think overheard that?

"A. [Juror 6]. [Juror 3]. I'm not sure if there were any others.

"Q. Okay. Did hearing that impact your ability to be a fair and impartial juror in this case?

"A. No.

"Q. Do you have any safety concerns yourself?

"A. Not yet.

"Q. And what do you mean by 'not yet'?

"A. Nothing. I haven't seen anything that makes me concerned so far.

"Q. Do you have any concerns delivering your verdict, whether it's not guilty or guilty?

"A. No.

"Q. Do you believe that you can still keep an open mind and decide the issues in this case based only on the evidence presented here in court?

"A. Yes.

"Q. Is there anything at all, including this discussion, that would affect your ability to be a fair and impartial juror in this case and to follow my instructions?

"A. No."

Based on those answers, defense counsel asked that Juror 1 be excused, arguing that his answer of "not yet" to the trial court's question about safety concerns and his "vivid recollection" of overhearing Juror 7's concerns demonstrated that he, too, must have concerns.

The trial court reserved decision on defense counsel's request and proceeded to canvass the remaining jurors. They all indicated that they did not "have any conversations or overhear any conversations with any juror about concerns about the trial, issues related to it or delivering a verdict." Each juror also indicated that there was not "anything at all, including this discussion, that would affect [the juror's] ability to be a fair and impartial juror and [to] follow the court's instructions." Jurors 3 and 6, whom Juror 1 identified as having overheard Juror 7's safety concerns, both answered that they had not overheard any other juror's concerns, that they could serve fairly and impartially as jurors, and that they had no safety concerns of their own. The court indicated that it asked about the safety concerns of only these two jurors because "the door was opened by Juror 1 on the issue . . . ."

After the trial court's canvass of the jury, defense counsel renewed his motion for a mistrial, which is the basis for the defendant's claim on appeal. Defense counsel argued that "the [canvass] process itself" made it impossible for the remaining jurors to be fair and impartial, and that Jurors 1, 3, and 6 should have been excused on the ground that they may have overheard Juror 7's concerns. The trial court denied defense counsel's motion, explaining: "The court is satisfied that the approach that it has taken today is the appropriate approach . . . . By inquiring of each juror, I was able to perceive not only their answers to my questions, but their demeanor. . . . I am assured by Juror 7's excus[al] from the jury that this jury remains fair and impartial. . . . With regard to [Jurors] 1, 3, and 6, I specifically inquired of those individuals concerning safety concerns only because they were the only individuals with any testimony concerning any substantive answers other than 'no' to the questions that I asked. And I'm assured by their answers that they remain fair and impartial. Based on those observations and their answers to my questions, which I do credit the truthfulness of, the motion for a mistrial is denied, but defense's record is preserved for appeal, if appropriate."

Having recounted the extensive record developed by the trial court and by the parties, we turn to the applicable standard of review. "In our review of the denial of a motion for mistrial, we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . .

"Potential juror bias is considered akin to other misconduct that similarly might affect a juror's impartiality, thus potentially violating a core requirement of the right to trial by jury guaranteed by the constitution of Connecticut, article first, § 8, and by the sixth amendment to the United States constitution. . . . Judicial inquiry into jury tampering is governed by the same

standards as other possible instances of jury bias. . . . Thus, [w]ith respect to allegations that a juror potentially may be biased, [e]ven where a juror has formed some preconceived opinion as to the guilt of an accused, a juror is sufficiently impartial if he or she can set aside that opinion and render a verdict based on evidence in the case. . . . Only where a juror has indicated a refusal to consider testimony and displayed evidence of a closed mind concerning [the] defendant's innocence can it be said that [the court] abused its discretion in refusing to [remove] a juror [from the panel]. . . . It is enough if a juror is able to set aside any preconceived notions and decide the case on the evidence presented and the instructions given by the court. . . . While we recognize that a juror's assurances that he or she is equal to the task are not dispositive of the rights of an accused . . . we are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context. . . .

"The trial court's assessment of the juror's assurances, while entitled to deference, must be realistic and informed by inquiries adequate in the context of the case to ascertain the nature and import of any potential juror bias. . . . The inquiry need not, however, be lengthy, so long as the questions, viewed in the context of the juror's answers, are adequate for the trial court to determine that the juror can indeed serve fairly and impartially. . . . The nature and quality of the juror's assurances [are] of paramount importance; the juror must be unequivocal about his or her ability to be fair and impartial." (Citations omitted; internal quotation marks omitted.) *State* v. *Berrios*, 320 Conn. 265, 274–76, 129 A.3d 696 (2016).

In *Remmer* v. *United States*, supra, 347 U.S. 229, the United States Supreme Court held that certain forms of jury tampering or interference create a presumption of prejudice and require a new trial unless the state rebuts this presumption. See *State* v. *Berrios*, supra, 320 Conn. 278–79. The *Remmer* presumption applies "to external

interference with the jury's deliberative process via private communication, contact, or tampering with jurors that relates directly to the matter being tried." (Footnote omitted.) Id., 292. "In determining whether the presumption is triggered, we refer back to the factors the Supreme Court deemed important . . . . Those factors are: any private communication; any private contact; any tampering; directly or indirectly with a juror during trial; about the matter before the jury. . . . Put differently, the improper contact must pertain directly to the merits of the matter, rather than merely relate to the trial more topically." (Citations omitted; internal quotation marks omitted.) Id., 292 n.25. "We emphasize, however, that the burden remains on the defendant to show prima facie entitlement to the *Remmer* presumption; evidence, rather than speculation, is required to shift the burden of proof to the state." Id., 293.

We first address the defendant's argument that he is entitled to a presumption of prejudice under *Remmer* and *Berrios*. The defendant argues that, due to Juror 7's alleged safety concerns "arising from the ominous interactions [with] the trial attendee" as she walked to her car, as well as "the knock-on effect that interaction and the fear it inspired had on (at least) Jurors [1, 3, and 6], [and] the likelihood that other jurors observed some of the same behaviors or forces," he is entitled to the *Remmer* presumption of prejudice. We are not persuaded.

A threshold requirement for invoking the *Remmer* presumption of prejudice is that "the improper [juror] contact . . . pertain directly to the merits of the matter, rather than merely relate to the trial more topically." *State* v. *Berrios*, supra, 320 Conn. 292 n.25. Here, the defendant has made no such showing. Indeed, the only inference of interference or tampering that the defendant unearthed in the trial court's exhaustive review of this issue was a juror who felt that one or more trial attendees watched her walk to her car, before or after one of these attendees commented on her coat. We observe that Juror 7 denied ever having or expressing any concerns

about her safety, Juror 1 was the only juror who testified that Juror 7 had expressed such a concern, the trial court made no finding that threatening or intimidating conduct had occurred, and Juror 7 was excused because of her own conduct rather than because of any such efforts at intimidation. For these reasons, the defendant has not "show[n] prima facie entitlement to the *Remmer* presumption . . . ." Id., 293.

Having declined to apply the *Remmer* presumption, we now consider the defendant's claim that the trial court abused its discretion by not granting defense counsel's motion for a mistrial and by not excusing Jurors 1, 3, and 6. We first address the defendant's argument that the trial court erred in declining to grant the motion for a mistrial and hold that the court did not abuse its discretion by denying that motion. Indeed, having reproduced the record development efforts of the trial court at great length in this opinion, we conclude that it carefully considered the gravity of the defendant's claim and that it proceeded with great care. At the outset, the trial court sought to make an accurate record of Juror 7's initial interactions with court staff and the nature of her safety concerns. It then accommodated defense counsel's request to "order [Juror 7] to sit in that chair and [to] testify," which revealed that Juror 7 was not forthcoming in open court about her safety concerns. The court then excused Juror 7 and sought defense counsel's input on the canvass questions. After completing the full jury canvass, the trial court observed that it was satisfied that, during the canvass, it "was able to perceive not only [the jurors'] answers to [its] questions, but their demeanor." No other jurors stated that they had safety concerns. We conclude that the trial court's inquiry was "realistic and informed by inquiries adequate in the context of the case to ascertain the nature and import of any potential juror bias" and that each juror was "unequivocal about his or her ability to be fair and impartial." (Internal quotation marks omitted.) *State* v. *Berrios*, supra, 320 Conn. 275–76.

We next address the defendant's argument that the trial court abused its discretion by declining, at a minimum, to excuse Jurors 1, 3, and 6. Regarding Jurors 3 and 6, it is speculative for the defendant to claim that those jurors had safety concerns despite their unequivocal testimony to the contrary. Once Juror 1 testified that Jurors 3 and 6 had overheard Juror 7's safety concerns, the court balanced the need to sufficiently canvass Jurors 3 and 6 against the risk of creating new safety concerns through its questioning. In response to the court's questions, Jurors 3 and 6 unequivocally stated that they did not overhear other jurors' concerns, that they could be fair and impartial, and that they had no safety concerns of their own. That is, despite Juror 1's testimony, the canvasses of Jurors 3 and 6 revealed no hint of concern. Even if there were a nonspeculative reason to think that Jurors 3 and 6 lied under oath and did, indeed, harbor safety concerns, the trial court, which had the unique opportunity to observe the two jurors and to make credibility determinations, did not abuse its discretion in resolving this issue through a meticulous and exhaustive canvassing process.

Similarly, the trial court did not abuse its discretion in declining to excuse Juror 1. The defendant makes two arguments regarding Juror 1. First, he argues that, because Juror 1 answered "[n]ot yet" when asked if he had safety concerns, and because he said that nothing made him concerned "so far," the trial court should have considered these answers to be equivocal and should have excused Juror 1. Specifically, the defendant contends that these "equivocal answers communicated the troubling message that Juror 1 at the very least anticipated having reason to fear for his safety as a result of his jury service." We disagree. The court reasonably understood these answers to communicate that, at the time of questioning, Juror 1 did not have any safety concerns, as there is nothing in the record to indicate that Juror 1 "anticipated" any safety concerns in the future, and his answers concerned only the present moment. Furthermore, Juror 1 unequivocally told the court that nothing

that had happened, including the court's questioning, affected his ability to keep an open mind, to decide the case solely on the basis of the evidence presented at trial, to follow the court's instructions, to be a fair and impartial juror, or to deliver a verdict, regardless of whether that verdict was guilty or not guilty. Overall, the record reflects that the trial court undertook the necessary inquiry and found no signs of equivocation.

Second, the defendant contends, without reference to any record evidence, that Juror 1 subjectively believed that the trial court cajoled him into disavowing his safety concerns.[2] For this reason, the defendant argues, the court should have recognized Juror 1's supposed perception that he was under duress, interpreted Juror 1's unequivocal answers as, in fact, equivocal for this reason, and excused Juror 1 for cause. This argument is speculative and without merit. We conclude that the trial court did not abuse its discretion in any of the proceedings or rulings concerning the juror canvass.

II

We next address the defendant's claim that the prosecutor committed two instances of prosecutorial impropriety during the questioning of witnesses, such that the state deprived the defendant of his constitutional right to a fair trial. The defendant argues that, when the prosecutor attempted to refresh Harris' recollection of his disavowed sworn statement to the police by reading him each sentence of the statement at trial, it was improper for the prosecutor to read a sentence containing "word on the street" hearsay that the defendant shot the victim. The state responds that asking Harris whether

---

[2]Specifically, the defendant asserts: "The subsequent questions were clearly understood by Juror 1 as an opportunity to clean up his honest (but apparently 'wrong,' to the court) equivocal answers. . . . On the third try, he finally gave what he perceived to be the answer the court was looking for: an unequivocal 'no'—not '[n]ot yet,' not 'nothing . . . so far,' his first two answers. That sequence of equivocations followed by Juror 1's apparent attempt to tell the court what he assumed it wanted to hear cannot withstand the scrutiny this court must give those responses."

he recalls this sentence from his prior sworn statement cannot constitute prosecutorial impropriety because it was a single question asked by counsel, there was no prior order prohibiting reference to this hearsay statement, and defense counsel did not contemporaneously object, even though he must have known that Harris' entire prior sworn statement would be read aloud.

Separately, the defendant also argues that it was improper for the prosecutor to impeach Rosado's credibility at trial by recounting the circumstances of Rosado's arrest pursuant to a capias warrant.[3] Relevant to this argument is that Rosado told his associates to "pack the courtroom" as he was being arrested. The defendant contends that this statement, once read into the record, served "the wholly improper purpose of inflaming the emotions, prejudices, and fears of the jurors" given the trial court's recent resolution of possible juror safety concerns. The state responds that the prosecutor had a good faith basis to pursue a line of questioning that would undermine Rosado's credibility and that, after defense counsel failed to object to the prosecutor's line of questioning, counsel extensively cross-examined Rosado on the same topic.

The following additional facts and procedural history are relevant to our resolution of the defendant's claim regarding Harris. As previously discussed, Harris, a member of Sandz-Bridge, provided a sworn statement to the police that the defendant spat at him during the concert and that he was walking with the victim after the concert when the shooting occurred. When called to testify as a witness for the state during trial on March 2, 2023, Harris disavowed this sworn statement but acknowledged that it bore his signature. When the prosecutor subsequently sought to treat Harris as a hostile witness, defense counsel objected, arguing that there

---

[3] "A capias is a vehicle to compel attendance at a judicial proceeding." (Internal quotation marks omitted.) *Myers* v. *Commissioner of Correction*, 215 Conn. App. 592, 598 n.2, 284 A.3d 309 (2022), cert. denied, 346 Conn. 1021, 293 A.3d 897 (2023), and cert. denied sub nom. *Myers* v. *State*, 346 Conn. 1021, 293 A.3d 897 (2023).

was not an adequate foundation. The prosecutor then indicated that he would lay a foundation by attempting to refresh Harris' recollection of his statement, "line by line." This questioning proceeded through each sentence of Harris' statement.

Once the prosecutor reached the sentence containing the hearsay at issue, he attempted to refresh Harris' recollection in the same manner as with the other sentences in Harris' prior sworn statement. The prosecutor, referring to the defendant as "Decky" and to the victim as "Kenny," asked: "Do you recall saying, 'I had heard from people that word on the street was that Decky was the guy who shot Kenny?'" Over no contemporaneous objection by defense counsel, Harris responded that he did not remember this sentence of his sworn statement, just as he did not remember the other sentences.

After the prosecutor attempted to refresh Harris' recollection of each remaining sentence of his sworn statement, defense counsel asked the trial court to excuse the jury and Harris. Once they left the courtroom, defense counsel stated that, although he had not wanted to draw the jury's attention to the hearsay statement by contemporaneously objecting, he believed that the hearsay statement was prejudicial to the defendant. He further indicated that, if the prosecutor "continue[d] with this," he would "have to contemplate whether . . . to move for a mistrial," ultimately asking that both the prosecutor's question and Harris' answer be stricken. The prosecutor responded that defense counsel did not object to the question when it was asked and that striking the question and answer—after Harris denied remembering the sentence—would risk the impression that the prosecutor "made something up and put it in the statement."

The prosecutor suggested to the trial court that, because he would eventually offer Harris' entire disavowed sworn statement as substantive evidence pursuant to *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), the court could give a limiting instruction

regarding the hearsay sentence or redact it from the *Whelan* statement once the statement was admitted into evidence. The court asked defense counsel how he would prefer to proceed, and counsel indicated that the best approach would be to remind the jury that questions by counsel are not evidence. The court instructed the jury accordingly.

At the beginning of the next day of trial, the trial court ordered that, if a similar situation arose concerning hearsay statements in a prior sworn statement that the prosecutor planned to admit under *Whelan*, the prosecutor may not refer to those hearsay statements. The prosecutor did not violate this order and did not refer to Harris' "word on the street" hearsay sentence again. Ultimately, when the court admitted Harris' prior sworn statement as substantive evidence under *Whelan*, the state redacted the hearsay sentence at issue.

We begin with the applicable standard of review. "[A] claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987). . . . In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Sullivan*, 351 Conn. 798, 809–10, 334 A.3d 446 (2025). Prosecutorial improprieties may occur during the examination of any witness. See, e.g., *State* v. *Warholic*, 278 Conn. 354, 380, 897 A.2d 569 (2006). They "may be so clearly inflammatory as to be incapable of correction by action of the court. . . . In such instances there is a reasonable possibility that the improprieties . . . either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal." (Internal quotation marks omitted.) Id.

"[W]e note that the defendant's failure to object at trial to each of the occurrences that he now raises as instances of prosecutorial impropriety, though relevant to our inquiry, is not fatal to review of his claims. . . . This does not mean, however, that the absence of an objection at trial does not play a significant role in the determination of whether the challenged statements were, in fact, improper. . . . To the contrary, we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Taft*, 306 Conn. 749, 762, 51 A.3d 988 (2012).

To resolve the defendant's claim that it was improper for the prosecutor to ask a question of Harris that contained a hearsay statement from Harris' prior sworn statement, "we must [first] determine whether any impropriety in fact occurred . . . ." (Internal quotation marks omitted.) *State* v. *Sullivan*, supra, 351 Conn. 810. In contending that this question of Harris constituted prosecutorial impropriety, the defendant primarily analogizes this case to *State* v. *McLaren*, 127 Conn. App. 70, 15 A.3d 183 (2011). *McLaren* is, however, distinguishable from the present case. In *McLaren*, the Appellate Court concluded that prosecutorial impropriety occurred when the prosecutor, during both cross-examination and rebuttal closing argument, referred to an inculpatory out-of-court statement that the trial court previously had excluded from evidence, even by reference, by granting a motion in limine. See id., 80–82. The prosecutor's violation of the trial court's order was, for that reason alone, prosecutorial impropriety. See id., 81. The Appellate Court in *McLaren* also held that "[i]t was improper for the prosecutor to ask about a specific inculpatory comment found in the police report and again refer to that comment during closing rebuttal argument because the police report was not in evidence, it was never offered as an exhibit, [the declarant] did not testify, and there was

nothing in the record that substantiated the content of [the declarant's] statement." Id., 82.

Here, the prosecutor violated no order of the trial court by asking Harris whether he authored the hearsay sentence in his prior sworn statement, and the prosecutor did not attempt to use the hearsay sentence as substantive evidence. The ostensible purpose for asking Harris about the hearsay sentence was to lay a foundation for treating Harris as a hostile witness and to provide a basis for admitting Harris' prior sworn statement under *Whelan*. Once the trial court ordered the prosecutor not to refer to the hearsay sentence again, he complied with this order, neither using the statement as substantive evidence nor referring to it at any point in time thereafter. See, e.g., *State* v. *Garcia*, 7 Conn. App. 367, 374, 509 A.2d 31 (1986) ("[t]here were no attempts by the prosecutor to 'hammer' home his point to the jury, nor did he make repeated efforts to introduce inadmissible evidence"). Accordingly, under the circumstances of this case, we find no prosecutorial impropriety with respect to this single question.[4]

[4]Although the alleged impropriety was indeed a single question—as the state's counsel stressed at oral argument—this fact does not automatically render the prosecutor's conduct proper. "As this court has often emphasized, a prosecutor is not only an officer of the court, like every attorney, but is also a *high public officer*, *representing the people of the* [*s*]*tate, who seek impartial justice* for the guilty as much as for the innocent. . . . A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Sullivan*, supra, 351 Conn. 811. It may be true that the prosecutor read Harris' prior sworn statement aloud for the sake of laying a foundation to treat Harris as a hostile witness, but there was no need to read every single sentence of Harris' statement in the presence of the jury. Just as the prosecutor argued that defense counsel must have known that the hearsay sentence would be read into the record as part of reading Harris' entire prior sworn statement, so, too, must the prosecutor have known his own line of questioning. The "word on the street" hearsay contained in the prosecutor's question, suggesting that it was common knowledge within the community that the defendant shot the victim, relates to the ultimate issue of guilt in the defendant's murder trial. In this specific case, the prosecutor's conduct in asking this question

We now turn to the defendant's claim of prosecutorial impropriety concerning Rosado's testimony. The following additional facts and procedural history are relevant to this separate, alleged instance of prosecutorial impropriety that occurred later in the defendant's trial.

Rosado was an eyewitness who provided a sworn statement to the police that he witnessed the fatal shooting at issue in this case. Rosado was subpoenaed to testify at the defendant's trial but failed to comply with the subpoena. He was thereafter arrested on a capias warrant to compel his appearance. Rosado testified on March 10, 2023, following the trial court's jury canvass. During direct examination, the prosecutor asked: "Yesterday, when you were taken into custody by some of the officers and inspectors . . . why were you yelling to the group to 'pack the courtroom?'" Rosado denied making this statement, although he acknowledged that he was arrested in the presence of his friends. After Rosado denied that any of his "Sandz friends" were present in the courtroom, the prosecutor asked him whether "[a]nybody that you would call 'your boys' [is] in the courtroom?" Rosado answered: "Yeah. Some of them [are] here." The prosecutor also asked Rosado what "signal" he "flashed" to the gallery when he took the stand. Rosado responded that he was greeting his mother. Defense counsel did not object to any of these questions.

On cross-examination, defense counsel also asked Rosado about the circumstances of his capias arrest. Rosado told the jury that, during his arrest, "about fifteen officers" blocked his car, drew their guns, pulled him out of his car, put him in handcuffs, and "threw" him into a police cruiser. Later during cross-examination, defense counsel asked Rosado if he would be surprised to learn that police reports describing his capias arrest did not mention that any guns were drawn. After some clarification of the question, Rosado responded: "Oh. Nah. They put what they want to put [i]n them reports."

may not have been improper, but it is still too close a call from a high public officer for us to endorse.

On redirect examination, the prosecutor asked Rosado whether he had previously told the police that he carries a gun because he is a witness in this case. Rosado denied that he had told the police that he carries a gun or that he was worried about being a "snitch" but admitted that he had told the police that he would not testify.

We evaluate the defendant's claim regarding Rosado pursuant to the same legal standard governing prosecutorial impropriety that we previously set forth. Additionally, relevant to this issue, "[i]t is well established that a prosecutor should not appeal to the emotions, passions and prejudices of the jurors. . . . [S]uch appeals should be avoided because they have the effect of diverting the [jurors'] attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors [that] are likely to skew that appraisal. . . . It must be acknowledged that the line between comments that risk invoking the passions and prejudices of the jurors and those that are permissible rhetorical flourishes is not always easy to draw. The more closely the comments are connected to relevant facts disclosed by the evidence, however, the more likely they will be deemed permissible. . . . By contrast, statements that have no reasonable connection to evidence offered or issues presented in a case are more likely to be deemed improper." (Citations omitted; internal quotation marks omitted.) *State* v. *Sullivan*, supra, 351 Conn. 812.

The defendant argues that the prosecutor's impeachment of Rosado was for "the wholly improper purpose of inflaming the emotions, prejudices, and fears of the jurors." We disagree. Given that Rosado disavowed his prior sworn statement that he had witnessed the fatal shooting, it was not improper to undermine his current testimony by impeaching him as someone who had changed his story to spread the word that he was not a snitch. The prosecutor's questions about Rosado's noncompliance with his trial subpoena, Rosado's statement

to investigators that he carried a gun because he was labeled a "snitch" for giving his prior sworn statement, Rosado's telling his associates to "pack the courtroom," and Rosado's potentially signaling to people he knows in the courtroom are all lines of questioning that were permissible to discredit Rosado's lack of recollection. Further, defense counsel questioned Rosado about the circumstances of his arrest at least as extensively as the prosecutor did. Defense counsel's own elicitation of Rosado's testimony "suggests that defense counsel did not believe that it was [improper] in light of the record of the case at the time." (Internal quotation marks omitted.) *State* v. *Taft*, supra, 306 Conn. 762. Accordingly, we conclude that there was no prosecutorial impropriety in this case.

The judgment is affirmed.

In this opinion the other justices concurred.